## THE PEOPLE *v.* ROBERT S. DODGE.

COURT MAY ALTER OR ADD TO INSTRUCTIONS ASKED. — The Court is not required, in a criminal case, to give instructions in the precise language asked by counsel, without addition, even if they state the law correctly so far as they go; but it may modify or add to the instructions asked, provided the law material to the case is clearly and correctly given.

JURISDICTION OF SUPREME COURT IN CRIMINAL CASE. — The question, whether the Supreme Court has any jurisdiction under the Constitution to review a verdict in a criminal case upon a question of fact, raised by the Attorney-General, but not decided.

APPEAL from the District Court, Fourteenth Judicial District, Nevada County.

The defendant was convicted of murder in the first degree, and appealed.

The other facts are stated in the opinion of the Court.

*Dibble, Byrne & Belden,* for Appellant, argued that it was the right of counsel in a case of this character to meet each and every material point in the case by an apt instruction bearing directly upon it without having the Court annex to it any restrictions, qualifications, or general legal propositions, and that this was peculiarly so in a case like this, where the evidence was wholly circumstantial ; and cited *People* v. *Echert,* 19 Cal. 605.

*J. G. McCullough, Attorney-General,* for the People, argued that the Court had a right to modify the instructions, and that no error grew out of the mere modification if the law was correctly stated ; and cited *Boyce* v. *Cal. Stage Co.* 25 Cal. 470.

By the Court, SAWYER, J. :

The defendant asked the Court to give the jury the following instruction : " That the defendant is not required to prove where he was or how he was engaged when Mark Hammock was killed ; but the prosecution must establish beyond a reasonable doubt that he was at Ahearn's and shot Mark Hammock, or the jury will find the defendant not guilty." The Court gave the instruction, but also added the following : " But if the jury are convinced, from all the evidence in the case, that defendant killed the deceased as charged in the indictment, it is not necessary to his conviction that any witness should have seen the defendant in the vicinity of the scene of the homicide at the time, or on the night of its occurrence." Defendant claims that the Court erred in adding to the instruction as asked. It is not claimed that there is any

57

error in principle stated in the supplementary matter, or that the whole taken together is erroneous. But it is claimed that the defendant is entitled to have the instructions asked, if sound in themselves, submitted to the jury in the precise language adopted by counsel, without any modification or addition by the Court. To this principle we cannot subscribe. The prisoner is entitled to have an instruction or charge upon every point of law material to the case, and necessary for the information of the jury; and to have the law fully, clearly and fairly stated. When an instruction asked is correct in principle, pertinent to the case, and expressed in clear and explicit language, not liable to be misunderstood, the Court should undoubtedly give it. But we know of no rule of law which requires the Court to present the law in the precise language and arrangement selected by counsel, without change, subtraction or addition. It is very easy for ingenious counsel to so frame a proposition as to state the rule of law correctly, and yet convey to the jury, who only hear it read once, a very erroneous impression; or to stop far short of the whole principle proper to be stated. It would be manifestly improper to give such an instruction to the jury without comment or explanation. The views expressed in *Boyce* v. *California Stage Company*, 25 Cal. 460, apply to criminal as well as civil cases. (See also *People* v. *Kelley*, 28 Cal. 425 ; *Mark* v. *State*, 36 Miss. 94, 95 ; *State* v. *Collins*, 20 Iow. 90 ; *State* v. *Turner*, 19 Iow. 148.) In this case the instruction was in no respect changed. Not a word was omitted, and the addition made by the Court did not in any respect change the meaning or modify or qualify the sense of that which preceded, but only stated a further principle pertinent to the case, and germane to the point of the instruction asked and given. It is not pretended that the Court was not authorized to give the addition in its own charge, or as an independent proposition. The principle being correct, there was no error in stating it in connection with an instruction asked by defendant relating to the same point. The prisoner certainly has no ground to complain of

the charge or instructions in any particular, for every princi-
ple of law that could operate in his favor was fully and clearly
stated in the charge of the Court, and repeated over and over
again in the instructions given at his request, in almost every
form that the ingenuity of counsel could devise. The jury
could not have been misled by the matter added to the sev-
enth instruction.

The only other point made, is, that the evidence is insuffi-
cient to justify the verdict.

We have carefully examined the testimony, and we cannot
say that the evidence is such that we should be justified in
setting aside the verdict on that ground. The evidence con-
necting the prisoner with the homicide is circumstantial, it is
true, but there is a chain of facts well established by the testi-
mony, all of which point directly to the defendant as the
guilty party. There was a motive clearly shown arising out
of the quarrel between deceased and the prisoner's brother,
Josiah, which quarrel the prisoner, on various occasions,
manifested a disposition to take off his brother's hands, and
for reasons given. The murder was committed about ten
o'clock at night, by shooting deceased through the window at
Ahearn's saloon, where a raffle for a horse belonging to the
deceased had taken place that evening. The contemplated
raffle had been generally talked about in the neighborhood,
and was generally known. The fatal charge consisted of five
bullets, and must have been fired from some smooth bore gun.
The report was unusually loud, indicating a very heavy
charge. The prisoner lived with his brother some three miles
distant from the scene of the murder in the direction of the
Forrest House. On the afternoon preceding the murder, the
prisoner and the deceased had been at the Forrest House.
Late in the afternoon the deceased left, going in the direction
of Ahearn's saloon, and the prisoner soon after followed in the
same direction. A little before sunset the prisoner arrived at
his brother's house, where he resided, and found a boy with a
double-barrel shot gun, which he borrowed of the boy on the
pretense of going quail hunting the next day. The gun was

at the time loaded with small shot.   The prisoner discharged one barrel at a mark to see, as he said, whether it scattered. Another party with him afterward discharged the other barrel. The prisoner and his brother went aside and had some conversation by themselves.   "About candlelight" the family, consisting of some six adult persons, viz: Josiah Dodge and his wife, Robert Dodge, (the prisoner), Billy Turner, Robert Underwood, and one Garvin, took supper together at the house of Josiah Dodge.   Robert left the table before the rest, and was not seen by Underwood again till about eight o'clock on the next morning, and, from the time he left the table till Underwood saw him the next day, he was not seen by any witness who identified him.   Underwood and the rest of the party who were together at supper, including Josiah Dodge, continued together till nine o'clock, when they retired, at the request of Mrs. Dodge.   Josiah Dodge and Underwood were playing cards during the evening.   Underwood, (who is a brother of Mrs. Dodge) when he was at Josiah Dodge's, had been in the habit of sleeping with the prisoner, Robert.   On that evening, Mrs. Dodge requested him to sleep with Garvin—stating, as a reason, that Robert's bed was not made— and he did so.   On the next night he again slept with the prisoner, as usual.   On the night of the homicide, between the time when the prisoner left the table at the house of Josiah Dodge, and the time of the homicide, several different witnesses, at different points on the road between the house of Josiah Dodge and Ahearn's saloon, met a man with his coat buttoned up to his chin, and his hat slouched over his eyes, with a double-barrel shot gun; and still later, a man of similar description, apparently having a gun partially concealed under his coat, was seen to step off the end of the porch in front of Ahearn's saloon.   On the morning after the homicide, the prisoner and Garvin went hunting, taking the shot gun borrowed the evening before.   They stopped at Davis' to get another gun, and were informed there of the homicide; whereupon they concluded not to continue the hunt, the prisoner remarking that it would be dangerous to be seen out

with a gun, as they might be suspected. One barrel of the shot gun was discharged that morning, and the gun returned to the owner that day (Monday.) During the day the prisoner expressed his satisfaction in decided terms that Hammock had been killed. After the gun was returned, it stood till Thursday in the bar room of the house where it belonged, at the end of the bar. On Tuesday it was examined by a witness, who found the right barrel empty, and the left barrel loaded, with an exploded cap on the tube. He put down the ramrod, and found the charge to be about four° fingers deep, which he regarded a heavy charge. The boy who owned the gun, also, on Monday afternoon found the left barrel loaded, with an exploded cap on the tube, and the right barrel discharged. Another witness, on Thursday, in the presence of other witnesses, found the gun in a similar condition, and drew the charge, which consisted of five leaden bullets—the same number as was taken from the body of the deceased, and corresponding with them in size and appearance. There was a rifle and bullet pouch, belonging to Josiah Dodge, hanging on hooks in a room at his house. On Monday, the 9th, Underwood found bullets in the pouch fitting the rifle. On the next morning, the 10th, he went to load the rifle and found bullets fitting the rifle and others too small, and the smaller bullets in the pouch corresponded in size with the bullets which were taken out of the body of the deceased. He found no small shot, and the bullets found in the undischarged barrel of the shot gun borrowed by defendant were not such as are ordinarily used for shooting quail—the purpose for which the gun was ostensibly used by the prisoner. There was also a loaded revolver found in the house of Josiah Dodge.

These are the leading facts, although there are some other particulars. There was, then, a motive for the homicide, and the prisoner had reason to believe that deceased would be at the place of the murder at the time of its commission. He had the means in his possession to commit the homicide, and they were procured just at the right time for the occasion, and corresponded precisely with the means by which the deed was

perpetrated. He disappeared from his brother's house about the time we should expect him to disappear, on the hypothesis that he is the guilty party, and is not seen again until the next morning; and soon after the time of his disappearance from the house a person, with such a gun as he had borrowed, was seen at different times and at different points upon the road between his brother's house and the locality of the homicide, and going towards it; just where the prisoner, if guilty, would naturally have been. The deed is done under such circumstances that he might have done it, and the bullets found in the body of the deceased corresponded in number, size and appearance with a charge found in the left barrel of the gun which he had in his possession, and returned on the next day, and also corresponded with other bullets found at his brother's house in a place accessible to him. The right barrel would be likely to be the one discharged first. All these facts, with other minor circumstances, point with great directness to the prisoner as the guilty party, and to no one else, unless it be his brother Josiah. But Josiah did not disappear, so far as is shown by the evidence. He was at home at nine o'clock, at the time when Robert was absent, and while the man, whoever he was, was seen from time to time on the road between Josiah's house and Ahearn's saloon. If it be conceded that the evidence tends strongly to connect Josiah with the act, as an accessory before the fact, it points still more strongly to the prisoner as the man who actually committed the deed. No other party than one of these is shown to have had a motive, or to have had, in any respect, a connection with the suspicious circumstances. And the prisoner has not attempted to give any account of himself from the time he left the party of five at the supper table, till the morning after the homicide was committed. Yet he stated on one occasion that he could prove that he was at home during that time. The jury were unable to reconcile the facts proved with any other reasonable hypothesis than the guilt of the prisoner. And no reasonable or plausible hypothesis, consistent with the innocence of the prisoner, has been suggested in the argument. Other hypoth-

eses may be imagined, it is true, but they do not arise out of, and are not suggested by the evidence. They would be mere fanciful speculations, without any substantial basis upon which to rest. We cannot say, therefore, that the evidence is so utterly deficient that this Court would be justified in setting aside a verdict with which both the jury, and the Judge before whom the case was tried, were satisfied.

The point is made by the Attorney-General that this Court has no jurisdiction under the Constitution to review a verdict upon a question of fact—that its appellate jurisdiction is limited to " questions of law alone." (Const., Art. VI, Sec. 4.) But the point was not argued by him, or referred to at all by the appellant's counsel, and the conclusion which we have attained upon the point as to the sufficiency of the evidence, obviates the necessity of deciding it. For these reasons we shall for the present reserve the question.

It follows that the judgment must be affirmed, and it is so ordered, with directions to the District Court to appoint a day for carrying the sentence into execution.