## DIMMICK v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 20, 1905.)

No. 1,112.

1. CRIMINAL LAW—REVIEW ON APPEAL—SUFFICIENCY OF EVIDENCE.

The credibility of witnesses and the probative force of facts introduced in evidence are matters solely within the province of the jury to determine. An appellate court cannot weigh the evidence, and the sole question thereon for its determination is whether there is any legal evidence to sustain the verdict.

2. LARCENY—SUFFICIENCY OF EVIDENCE.

It is not necessary to a conviction for larceny of money that the money, or any part of it, should be shown to have been in defendant's possession.

3. CRIMINAL LAW—PROOF OF CORPUS DELICTI.

It is now the well-settled rule that in all criminal cases the corpus delicti, as well as that defendant committed the crime, may be proved by circumstantial evidence.

[Ed. Note.—For cases in point, see vol. 14, Cent. Dig. Criminal Law, § 1269.]

4. LARCENY—SUFFICIENCY OF EVIDENCE.

Circumstantial evidence considered, and held sufficient to sustain a conviction for larceny.

5. CRIMINAL LAW—INSTRUCTIONS—CIRCUMSTANTIAL EVIDENCE.

Instructions upon circumstantial evidence in a criminal prosecution considered and approved.

6. LARCENY—SUFFICIENCY OF INDICTMENT—AVERMENT OF OWNERSHIP OF PROPERTY.

An indictment under Act March 3, 1875, 18 Stat. 479 [U. S. Comp. St. 1901, p. 3675], which charges defendant with stealing money "belonging to" the United States, sufficiently avers the ownership of the property stolen.

[Ed. Note.—For cases in point, see vol. 32, Cent. Dig. Larceny, § 81.]

7. CRIMINAL LAW—ADMISSION OF EVIDENCE—HARMLESS ERROR.

The admission of irrelevant testimony in a criminal case, which was afterward stricken out on motion of defendant's counsel, and which the jury were instructed to disregard, was not prejudicial.

8. LARCENY—EVIDENCE TO SHOW MOTIVE—FINANCIAL CONDITION OF DEFENDANT.

While evidence to show motive is not essential to conviction in a criminal prosecution, where the guilt of defendant is clearly established it is admissible; and in a prosecution for larceny of money, where the evidence was largely circumstantial, it was not error to admit evidence to show that defendant was in debt at the time as tending to some extent to show a motive for the crime.

9. WITNESSES—IMPEACHMENT—EVIDENCE OF REPUTATION.

Where the reputation of a witness for truthfulness is assailed, the party calling him has the right to introduce testimony to show that his reputation is good not only at the time, but that it has always been good.

[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 1167-1169.]

10. LARCENY—EVIDENCE.

Where defendant charged with larceny of money from a mint while employed therein as clerk, to account for his presence there at unusual hours, testified that he went to check up the pay rolls, it was competent for the government to show the length of time required to perform such work.

135 F.—17

**11. CRIMINAL LAW—ARGUMENT OF COUNSEL.**

Where counsel for defendant in a criminal case based an argument to the jury on an assumption of facts not shown by the evidence, he cannot assign it as error that counsel for the prosecution, in answering such argument, also went outside the record.

**12. SAME—MISCONDUCT OF COUNSEL—OFFER OF INCOMPETENT EVIDENCE.**

Where it was sought to be shown on the cross-examination of a witness for the prosecution that he had not mentioned certain facts to which he testified at the time of their occurrence, the action of the district attorney in attempting to show by a subsequent witness that such mention had been made by the previous witness, while the evidence may not have been admissible, was not such misconduct as to be ground for reversing a judgment of conviction.

**13. SAME.**

Offers of evidence by the prosecution with respect to prior convictions of defendant for other offenses *held* not prejudicial to defendant's rights in view of the rulings and charge of the court.

**14. SAME—INSTRUCTIONS—REFUSAL OF REQUESTS.**

The refusal of requests for instructions is not error where the court in the charge given clearly and correctly covers all the principles applicable in the case.

In Error to the Circuit Court of the United States for the Northern District of California.

See 112 Fed. 350, 352.

The $30,000 alleged to have been stolen was taken from the vault of the mint between the annual settlement of June, 1900, at which time there was no shortage, and the annual settlement made in June, 1901, when the loss was discovered. The contention of the prosecution is that the money was stolen between February 5, 1901, and the 29th day of June, 1901. There were three trials of this case. On the first and second the jury disagreed; on the third, Dimmick was convicted. The testimony upon the third trial is exceedingly lengthy. Much of it was circumstantial in its character. Dimmick denied having taken the money, and gave many explanations in regard to the testimony of the witnesses for the government. His testimony on these points was the subject of much testimony on the part of the government, tending to show that some of the explanations given by him were not true. It was shown by the testimony on the part of the prosecution that Dimmick was discharged by the superintendent of the mint on February 5, 1901, for alleged peculations and fraud committed by him as chief clerk of the mint, but was retained, at Dimmick's request, for the purpose of enabling him to find some other employment. Late at night on the 18th of March, 1901, Cyrus Ellis, an inside watchman at the mint, testified that, being attracted by some noise in the cashier's room, he saw Dimmick come out of the receiving room into the corridor and go into the superintendent's room with two bags of coin in his arms, and soon thereafter saw him come out of the superintendent's room carrying a dress-suit case, which had the appearance of being very heavy, and go out at the main door upon the steps and down into the street. Dimmick denied that he was at the mint at night on March 18, 1901, and also denied that he ever had a dress-suit case at the mint, or that he ever had a dress-suit case. There were three mint employés, besides Ellis, who each testified that he saw Dimmick at the mint on the night in question. Healey, one of the inside watchmen, testified that he saw him leave the mint carrying a dress-suit case. Metcalf, the doorkeeper, saw a package in Dimmick's hand about the size of a dress-suit case, but did not notice it sufficiently to discern its character. When Dimmick went down the steps at the mint he was met by Bickford, an outside watchman, who testified that he walked with him to the street cars, and that Dimmick was carrying a dress-suit case. There were several other witnesses, who testified that on various other occasions they had seen Dimmick with a dress-suit case. Dimmick testified that he had carried some of his mint books, tied up in brown

paper, with a hand strap, to his home, in order to do some work thereon, and stated that the witnesses might have been mistaken as to the character of the bundle. The entries in the books were very few, and the last entry was made December 31, 1900, long previous to March, 1901. In the course of Dimmick's examination it was admitted by him that he never brought them away from the mint or carried them to his home between February 5, 1901, and June 30, 1901. There is a mass of testimony concerning the numbers of the combination of the locks, tending to show Dimmick's knowledge thereof, especially the fourth number, 15. There was testimony to the effect that Dimmick told Cole that 15 was his fourth number, and that 15 was a fixture. Dimmick testified at the last trial, "I have no recollection whatever of telling him [Cole] that my last figure was 15." On the second trial he testified as follows: "Q. Did you ever mention to Mr. Cole a single one of your old numbers before he stepped to the vault door to acquire a combination? A. I may have indicated to him the last figure; nothing else. Q. Did you? What is the fact? Did you give him any of your old numbers? A. When I set up the combination I stopped on 15, and, of course, showed him where the figures were on the dial. Q. I will try you once again. Did you give him any of the old numbers of the combination? A. Not for the purpose of making up his combination. Q. Did you give him any of the numbers of your combination for any purpose? A. Yes, sir. Q. What number did you give him? A. I told him I stopped on 15; it was my last number." Mr. Waltz, a witness on behalf of the government, testified that Dimmick told him that 15 was his last number; that 15 was a fixture; that he told Cole that 15 was a fixture. Dimmick's testimony in answer to Waltz was: "Q. Did you tell Mr. Waltz that 15 was a fixed number? A. No, sir, except he may have misunderstood, or I may have misunderstood his question. I told him the last figure was a fixed figure, and he probably asked me, 'Well, what is the last figure?' I could not recollect definitely what was the last figure on that combination, for I had in the meantime had charge of seven or eight other combinations. My experience with that combination was nearly two years previous, or a year and a half, and I could not recollect what was the last figure, and my impression is he then stated to me that 15 was the last figure. I said, 'Then that is the fixed number;' but I never intended to convey to him that the 15 which was the last changeable figure was a fixed figure. * * * Q. Taking that to be the interpretation of the record, did you say at any time say to Mr. Waltz—I repeat that simply so that there will be no misunderstanding about it—that number 15 was a fixed figure, one of those figures that could not be changed? A. Only as I may have had a misunderstanding about what was the last figure of the combination on that lock. All locks differ. On all of them the last figure or number or letter is a fixture, and each lock, each combination lock, differs as to the last number; and I could not recollect and did not recollect what was the fixed number on this particular combination, this upper lock." Dimmick's testimony at the mint investigation was: "Q. When you gave the combination to Mr. Cole, you say you gave him four numbers to change, and the last one stayed—remained. Is that what I understand you? A. Yes, sir. * * * Q. In other words, it changed three numbers? A. Yes, sir. Q. Was the first one changed? A. Yes, sir, and the second one, and the third one; those three changed. Q. The fourth one, I understand, is a fixed number? A. Yes, sir; I was so informed by the locksmith who taught me." Ryan, the locksmith, testified that he never told Dimmick that the fourth number was a fixed number. There was much testimony relative to the condition of the locks in the cashier's vaults. The different combinations that had been made, the intimate knowledge of Dimmick as to the locks and combinations, the changes Dimmick made in his testimony upon the three different trials of the case as to the condition of the locks, and the testimony of witnesses on the part of the government tending to show that some of the statements as made by Dimmick were not correct. It was shown that Dimmick had been cashier before he was appointed chief clerk of the mint, and as such was familiar with the locks, especially with the upper lock. There were nine witnesses who testified that they had seen Dimmick at this lock, looking at its parts, removing the hammer of the lock, and examining its interior in 1898 and 1899, while he was cashier. Dimmick

testified that he opened the lock only three times, once after an illness, in order to change his combination, and once later, because his numbers were so close as to make an interference between the tumblers of the lock; and once thereafter to oil the lock. At one of the former trials Dimmick testified that he had repeated occasions to oil the lock; at the last trial, that he oiled the lock only once. The testimony of the prosecution was to the effect that he took off the back plate off over 25 times, and that it was unnecessary to remove the plate in setting up a new combination.

When Cole was installed as cashier, the testimony shows that the superintendent instructed Dimmick to have Major Noggle, of the mint, who understood the business, or some locksmith, change the combination for Mr. Cole. Noggle was in the room, and offered to assist the cashier in changing the lock, but Dimmick had previously offered his services, and himself changed the combination for Cole. Cole testified that the first thing Dimmick did was to take off the back plate, and then he told Cole to pass him his number, giving an extra turn to the dial; that the effect of the extra turn was to throw out one of the numbers of the combination and reduce it to a three combination instead of four. Then Dimmick told him that the fourth number was a fixed number, 15. The testimony of Cole and Fitzpatrick was to the effect that Dimmick was engaged for two or three days, an hour or so at a time, in making these changes in the combination; that he stood before the lock with its back plate removed. Dimmick testified that he took off the back plate in order to line up the tumblers with his lead pencil; that when he first entered the mint as cashier, a locksmith was there and took off the back plate to change his combination, and lined up the tumblers with a lead pencil. We quote from the testimony of Dimmick: "The dial on this upper lock is peculiar in the fact that the numbers are mixed—that is, they do not run consecutively—and on the first time turning I turned a little too far to catch my number, and in putting up the combination in that way I told him I had turned past the number. He said, 'Very well, we will fix that,' and with that he asked for a screwdriver, took off the back plate, and lined up the tumblers. * * * Q. I want to know from you whether it was at the time the locksmith took off that back plate that he showed you about lining up the tumblers with a lead pencil? A. Yes, sir. Q. That was on the upper lock, was it not? A. Yes, sir." His testimony in regard to this matter at the mint examination was as follows: "Did he take out what you are doing now? A. No, I do not think he went through the same performance, because I did not make any mistake on mine. It only took fifteen minutes. He charged at the rate of a dollar a minute." At the first trial of this case Dimmick testified that the locksmith took off the back plate for the purpose of oiling the lock. At the mint investigation he said the locksmith took off the back plate in order to work the side clutch. At the second and third trials he testified that the locksmith removed the back plate because he (Dimmick) had made a mistake on the first turning. The government introduced testimony showing that one Ryan was the locksmith who changed the combination for Dimmick, that he was sent by his employers, and the written memorandum of the transaction was produced in evidence. Ryan testified that he was the locksmith, and that at no time in the course of changing the combination did he remove the back plate. Dimmick testified that Ryan was not the locksmith on the occasion referred to.

The testimony about the locks is, by a long train of circumstances, connected with another line of circumstances as to the conduct of Mr. Dimmick on the 28th and 29th days of June, 1901, at the time of counting the money at the annual settlement. This began at what is designated as the "M. and R. Vault." Cole, the cashier, was sick, and unable to be present to open the vault. It was shown in the testimony that Dimmick was perfectly familiar with the locks, and knew of the different combinations, and had taught Mr. Cole how to make his combinations. When it came to opening the vault at the time of settlement, Dimmick stated that he wanted nothing to do with the cashier's vault. After the superintendent, Major Noggle, and Mr. Day tried to open the vault on Cole's combination, and failed in their efforts for want of an extra turn, Dimmick never said a word about this extra turn, which he

himself had taught Cole, and was silent as to certain figures of the combination which he knew. He attempted, however, at their request, to open the vault, but did not succeed. It was proven that Dimmick had said he would not open the vault for any amount of money; that Cole was a crank, and that he (Dimmick) did not want to have anything to do with the cashier's vaults; and at one of the trials Dimmick testified that he did not want to bear the brunt of the cashier's mistakes. After the vault was opened, on June 28th, Dimmick, as chief clerk, made the daily count of the money in the vault. There was a pile of eagles in the vault, 135 bags, which Dimmick had counted for several nights before at 135, but on the evening in question he counted it as 136, making an overage of $5,000. On Sunday, June 30th, Dimmick went to the mint and counted 351 bags in a pile, which had been previously discussed. On the preceding Saturday night O'Neal, one of the mint employés, made the count 349, and advised Dimmick on the same day, but Dimmick set down the number of bags at 351, making an overage of two bags, $10,000.

There are several assignments of error which require examination. They may generally be classified under a few heads: (1) That the court erred in overruling the demurrer to the indictment; (2) that the court erred in admitting or refusing certain testimony, or in sustaining or overruling objections thereto; (3) that the evidence is wholly insufficient to sustain the verdict; (4) that the court erred in refusing to give certain instructions (about 50 in number) as asked for by counsel for plaintiff in error; (5) that the court erred in denying the motion of plaintiff in error in arrest of judgment; (6) that the conviction of the plaintiff in error is in violation of the fifth amendment to the Constitution of the United States, without due process of law, and "contrary to the law of the land."

George D. Collins, for plaintiff in error.

Marshall B. Woodworth, U. S. Atty., and P. F. Dunne, Sp. Asst. U. S. Atty.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after making the foregoing statement). 1. One of the principal questions discussed by counsel for the plaintiff in error relates to the credibility of the respective witnesses, and the weight and effect of the testimony given by them. The case was submitted upon briefs, the greater portion of which is directed to these points. The contention of the plaintiff in error is that the testimony on behalf of the government is false, and totally unworthy of belief, and that the testimony of the plaintiff in error is true, and should be accepted and acted upon by the court. The argument of counsel for the plaintiff in error is, in many respects, remarkable in its nature and character. It consists chiefly of a tirade of abuse against several of the witnesses who appeared and testified on the part of the government. To show the style of his argument, we quote his language with reference to one of the important witnesses:

"He gives testimony of such a character that no court could hesitate to denounce it and to condemn it for its manifest falsity. He tells a story that for downright infamy, flagrant and shameless mendacity, clearly apparent upon the very face of it, has never been equaled by the most reckless perjury ever committed in a court of justice. He is the only witness in the case who attempted to implicate the plaintiff in error. No court can read his testimony and accord it the slightest credence, it is so glaringly rank perjury."

Turning from this point, we quote the remarks of counsel as to the testimony of Dimmick:

"It furnishes a complete and most satisfactory explanation of every act and circumstance relied upon by the prosecution as imputing at least a suspicion, if not an incriminating suggestion. No one can read the testimony of Mr. Dimmick without being convinced that the charge made against him is absolutely unfounded."

It was the duty of the jury, under proper instructions from the court, to pass upon the question whether the witnesses told the truth or swore falsely. The court, at counsel's request, instructed the jury as follows:

"It is exclusively your province to determine from the evidence the facts in this case, and to decide the question of defendant's guilt or innocence. You are the exclusive judges of the credibility of the witnesses, and of the effect and value of their testimony."

It is not within the province of this court to interfere with the verdict of the jury upon this ground. The rule is well settled that the credibility of witnesses and the probative force of facts introduced in evidence are the sole province of the jury; that the appellate court cannot weigh the evidence; that the only question before the court is whether there is any legal evidence to sustain the verdict. In Humes v. United States, 170 U. S. 210, 212, 18 Sup. Ct. 603, 42 L. Ed. 1011, the court said:

"The alleged fact that the verdict was against the weight of evidence we are concluded from considering, if there was any evidence, proper to go to the jury, to sustain it. Crumpton v. United States, 138 U. S. 361 [11 Sup. Ct. 355, 34 L. Ed. 958]"; 2 Enc. Pl. & Pr. 391.

2. Is the testimony in the record sufficient to sustain the verdict of the jury? The record contains 1,095 pages of typewritten testimony, and covers a great variety of facts. Most of the testimony may be said to consist of what is known as circumstantial evidence, and, as is usually the case, there are many links in the long chain of circumstances which tend to show the guilt or innocence of the plaintiff in error. This being the third trial of the case, some of the testimony of the witnesses on the former trials was brought to the attention of some of the witnesses for the purpose either of impeachment or of weakening the testimony by showing a variance therein upon the respective trials; and all of these points are elaborately dwelt upon in the respective briefs of counsel. We have epitomized some of the testimony of the witnesses on the part of the prosecution in the statement of facts. It might, perhaps, be sufficient to say that the facts thus stated are, in our opinion, sufficient to authorize the court to submit the questions of fact to the jury, and to justify the jury in finding the plaintiff in error guilty of the offense charged in the indictment. It is, however, broadly claimed that, as against the theory of the prosecution "is the all-controlling fact that not as much as one cent of the missing thirty thousand dollars was ever traced to the possession or custody of Mr. Dimmick. There is not a word of testimony to show the essential trespass or asportation. In fact, the government has never been

able to follow, even darkly, the thirty thousand dollars, from and subsequent to its location in the cashier's vault, if it ever was located there. This point alone is conclusive against the conviction." It is a sufficient answer to this to say that it was not absolutely necessary, in order to convict, that the money alleged to have been stolen, or any part of it, was ever found in the possession of Dimmick. This question was raised and properly disposed of in the court below. At the close of the trial, counsel for the plaintiff in error asked the court to instruct the jury that:

"While it is not necessary, in order to convict the defendant, that you should find the money alleged to have been stolen, or any part of it, was seen in his possession, yet it is indispensable that the money, or some part of it, be shown to have been in his possession, or he must be acquitted."

This instruction was clearly erroneous. Among other things, the court correctly charged the jury:

"The precise time of the commission of an offense need not be proven as laid in the indictment; and if you believe that the defendant did steal, take, and carry away from the United States Mint the money described in the indictment, or any part thereof, between July 1, 1900, and June 27, 1901, and that such money was the property of the United States, it will be your duty to find the defendant guilty. * * * I further charge you that, in order to convict the defendant, it is not necessary that you should find that the money alleged to have been stolen, or any part of it, was ever seen in his possession."

Every criminal charge necessarily involves two distinct propositions: (1) That a criminal act has been committed; (2) that the guilt of such act attaches to the particular person charged with the commission of the offense. Each of these facts must be proved beyond a reasonable doubt, either by direct testimony or by presumptive evidence of the most cogent or irresistible kind. The proof must in both cases be clear and distinct, but it is not necessary that it should be direct and positive. The general rule is now well settled that in all criminal cases the corpus delicti may be established by circumstantial evidence. 7 Am. & Eng. Ency. Law (2d Ed.) 863, and numerous authorities there cited. See, also, State v. Minor, 106 Iowa, 642, 646, 77 N. W. 330; State v. Gates, 28 Wash. 689, 695, 69 Pac. 385, 387; Flower v. United States, 116 Fed. 241, 247, 53 C. C. A. 271; 6 Am. & Eng. Ency. Law (2d Ed.) 582, and authorities there cited.

It is argued by counsel for plaintiff in error that the evidence as to the shortage of money does not prove that the money had been stolen. That depends upon the character of the testimony. Can the shortage of the money be accounted for upon any other theory than that of theft? The shortage was discovered during the annual settlement about June 29, 1901. At first it was thought that there might have been a mixup of denominations in changing the money from one vault to another. Next, there might have been a mistake in the books. The matter was talked over by Mr. Dimmick, Mr. Leach, and other officers of the mint. Many theories were advanced and efforts made to discover how the shortage could have occurred. Mr. Dimmick was active in endeavoring to ascertain how it had occurred. His testimony in relation to this

point covers many pages of the transcript. The conclusion he arrived at is stated by him as follows:

"Q. Taking you to the next day, Monday, July 1st, what transpired with reference, of course, to that $30,000? A. In coming from Oakland on Monday morning, July 1st, after leaving the boat at the Oakland Depot, I got on a Mission street car, and while seated on the car Mr. Leach very soon got aboard, and he came and sat alongside of me, and said, 'Good morning, Mr. Dimmick. What do you think of this nightmare, for it is a nightmare; at least I have dreamed of it all night, or thought of it all night? What do you think of it?' I said, 'Mr Leach, I think it is a very serious matter.' He said, 'Well, it is a difference in count, is it not?' I said, 'No, I do not think it is a difference in count.' He said, 'Well, what do you think of it?' I said, 'I think it is a case of shortage.' He said, 'You astonish me.' I said, 'Yes, I think it is a case of shortage; and, further, I think it is a case of theft, for I have made some investigations of this matter, and I can arrive at no other conclusion than it is a case of shortage.' He said, 'Oh, it has not come to that.' I said, 'Yes, Mr. Leach, I think it is your duty to immediately report this matter to the secret service, and have them investigate or make an investigation of this matter, and in the meantime I think you should put all of us under surveillance until this matter is cleared up.' He said, 'My God, it has not come to that!' * * * Q. That is all that occurred? A. I think that is all that occurred."

There was ample testimony given at the trial tending to show that the money of the government was stolen from the mint, and that Dimmick was the person who committed the theft. A conviction based on reasonable inferences which the jurors had the right to draw from the evidence cannot be set aside as unsupported by evidence. In establishing the facts in this case the prosecution did not "rely solely upon inferences, presumptions resting upon the basis of another presumption," as repeatedly claimed by the plaintiff in error, but independently proved by a chain of facts the essential elements necessary to be proven. It is true, as stated in Wills on Circumstantial Evidence, 283, that every circumstance not clearly shown to be connected as its correlative with the hypothesis it is supposed to support must be rejected from the judicial balance. But, as recognized by the author, when it is distinctly established that there exists between the factum probandum and the facts which are adduced in proof of it, a real connection, "either evident and necessary, or so highly probable as to admit of no other reasonable explanation," the proof becomes sufficient.

The instructions of the court upon circumstantial evidence were full, clear, and correct, and are here inserted, in order to show that the court embodied therein the principles of law applicable to such cases:

"The law in regard to circumstantial evidence is this: In order to justify a jury in finding a verdict of guilty based entirely on circumstantial evidence, the circumstances must not only be consistent with the guilt of the defendant, but they must be inconsistent with any other reasonable hypothesis that can be predicated on the evidence; or, stated in another form, it is not sufficient that the circumstances proved coincide with, account for, and therefore render probable, the hypothesis of guilt asserted by the prosecution, but they must exclude to a moral certainty and beyond a reasonable doubt, every other hypothesis but the single one of guilt, or the jury must find the defendant not guilty. In order to warrant a conviction of crime on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt. All the facts necessary to the conclusion must be consistent with each other and with the main fact sought to be proved; and the circumstances, taken to-

gether, must be of a conclusive nature, leading on the whole to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty that the defendant, and no other person, committed the offense charged; and unless the evidence does so it will be your duty to acquit the defendant. So, gentlemen, you will observe that there is nothing very peculiar or hard to understand about this doctrine of circumstantial evidence. The jury, in the first place, must determine from the testimony of the witnesses what are the facts and circumstances in the case—the facts and circumstances which you believe have been established by the testimony; and then you simply apply your common sense and judgment to a consideration of what deductions or inferences or conclusions ought to be drawn from those facts. And if, on consideration of all the facts which you may believe to have been established by the evidence, you are satisfied in your own minds, beyond all reasonable doubt, that the defendant is guilty, then it is your duty to so declare; but, if you are not so satisfied, it will be your duty to render a verdict of not guilty."

In the light of all the facts contained in the record, we cannot accept the contention of counsel for the plaintiff in error, so earnestly and persistently set forth in his brief, that the evidence is so utterly deficient that this court would be justified in setting aside a verdict with which both the jury and the judge before whom the case was tried were satisfied.

3. It is claimed that in the first count of the indictment upon which the plaintiff in error was convicted "there is no averment of ownership in the United States," and that the word "belonging" is wholly insufficient. The statute reads:

"That any person who shall embezzle, steal, or purloin any money, property, record, voucher, or valuable thing whatever, of the moneys, goods, chattels, records, or property of the United States, shall be deemed guilty of felony, and on conviction thereof * * * shall be punished," etc. Supp. Rev. St. vol. 1 (2d Ed.) p. 88, c. 144 [U. S. Comp. St. 1901, p. 3675].

The objection urged to the sufficiency of the indictment is purely technical, and is trivial in its character. The word "belonging," in its common meaning, is "that which belongs to one; that which pertains to one; hence, goods or effects." Webster's Dictionary. The words as used in the statute would be sufficient in alleging the ownership of the property, but it is not necessary to use the exact words of the statute if words of equivalent import are employed. In State v. Ware, 62 Mo. 597, where the ownership of the property was alleged as "goods and chattels of one M.," instead of "belonging to," as used in the statute, this was held sufficient. While every indictment for larceny must allege an ownership of the property stolen, and would be defective without such allegation, there are no particular words or phrases which the law requires to be used. The allegation may be made by a variety of words and phrases, any of which will be sufficient if it clearly conveys the idea that such persons are the owners. 12 Enc. Pl. & Pr. 959, and authorities there cited.

4. With reference to the rulings of the court as to the admission or rejection of testimony:

(1) It is argued that the court erred in permitting the superintendent of the mint to narrate a conversation which he had with Dimmick on the 5th day of February, 1901, with reference to his position in the mint, and especially to the request then made of Dimmick by Leach, the

superintendent, to bring back the $1,338 that was claimed to be due on the bluestone account. There was considerable controversy between counsel as to whether that conversation and transaction had any relation whatever to the accusations made in the indictment. The record shows that the testimony of Leach in relation to these matters was, on motion of counsel for the plaintiff in error, stricken out. The court properly instructed the jury to disregard it, and the ruling of the court cannot be complained of by the plaintiff in error.

(2) The next specific objection is to the following questions asked Dimmick on his cross-examination: "What was your financial condition when you went first into that mint, in respect to your being in debt? * * * Did you continue to be in debt from that time until February 5, 1901, and thenceforward to July, 1901?" It is proper to state, in relation to these questions, that the existence or nonexistence of motive is immaterial where the guilt of the accused is clearly established; but, although not an essential element, it may throw some light on the intent with which the act was committed, and as a matter of evidence is frequently an important element in the case of the prosecution. Pointer v. United States, 151 U. S. 396, 414, 14 Sup. Ct. 410, 38 L. Ed. 208. We are of opinion that the court did not err in allowing these questions. The case depended, more or less upon circumstantial evidence, and the fact that Dimmick was in debt upon February 5, 1901, and in debt during the time that he had been in the employment of the mint, was a circumstance of perhaps no great weight or importance, but we are not prepared to say it was improper. The tendency of courts in cases of this character is to admit such testimony for what it is worth, because in a greater or less degree, under the facts of each case, it tends to show temptation or motive on the part of the defendant. United States v. Camp, 2 Idaho (Hasb.) 231, 10 Pac. 226; Bridges v. State (Ga.) 29 S. E. 859; Bish. New Cr. Pro. 327; 2 Wharton's Cr. L. §§ 1030, 1062a; 10 Am. & Eng. Ency. Law (2d Ed.) 1030.

In Bridges v. State, supra, the prosecution offered in evidence certain receipts, certificates, and promissory notes signed by the accused, for the purpose of showing that he was financially embarrassed during and at the time of the alleged embezzlement; that he was pressed for money, and in straitened circumstances, and that he had resorted to devious methods to raise money. The court said:

"In the trial of cases of embezzlement we think that any evidence which tends to show these things is competent and admissible. That a man is financially embarrassed, that he is in straitened circumstances, and that he owes money, tend in some degree to show a motive for the embezzlement."

(3) Objection is made to the allowance of the question propounded by the prosecution to the witness Dargie as to the reputation of the witness Ellis "in the community for truth, honesty, and integrity," and whether it "was good or bad," and it is claimed to be irrelevant because it was for the years 1883 and 1884, and therefore too remote. The plaintiff in error in the trial introduced witnesses who testified that Ellis' reputation in this regard was bad. His testimony was important, and tended strongly to implicate Dimmick as the person who had taken the money from the mint. A number of witnesses testified to his good reputation, covering a long period of years from 1883 up to the

time of the trial. This range of time covered by the inquiry was not, in the light of the circumstances of this case, too remote. The prosecution could not be limited to the years testified to by the witnesses on the part of the plaintiff in error. It had the right, after introducing testimony to the effect that his reputation was good during the years when it had been assailed by the other side, to show what his reputation had been in previous years. The limit placed upon time as to reputation is usually confined to a reasonable period with reference to the time when it is called in question. A man's reputation may change as years go by, but when assailed for a period of time he has the right not only to show that it was good during those years, but had always been good.

(4) It is claimed that the court erred in overruling the objection to the question asked by the prosecution of the witness Day as to how long it takes to check up pay rolls. Dimmick, in his testimony, in explaining why he went to the mint at the unseemly hours of night, had testified, among other things, in explanation thereof, that he went there to check up the pay rolls. Surely it was proper for the prosecution to show how long a time it would take to discharge this duty.

5. Did the court err in permitting counsel for the prosecution to comment upon testimony that had been offered and ruled out? Were the circumstances leading up to the argument of counsel of such a character as to prejudice the rights of the accused? What are the facts? The witness Ellis had testified to seeing Dimmick, on the night of March 18, 1901, remove two sacks of money from the vaults of the mint, and afterwards saw him carrying a dress-suit case, which seemed to be very heavy, when he left the mint that night. The question of whether Dimmick ever owned or carried a dress-suit case was the subject of much testimony pro and con. Dimmick testified that he never owned or carried a dress-suit case, and his testimony upon this point was, to a certain extent, corroborated by other witnesses. On the other hand, several witnesses testified to having seen him with a dress-suit case. Dimmick, in the course of his testimony, explained that he had at one time carried a large bundle of books bearing some resemblance in form to a dress-suit case, why he carried them, etc., leaving the impression, at least, that certain of the witnesses had mistaken what the bundle was. After Ellis had testified in chief as to what he saw on the occasion referred to, he was subjected to a rigid and lengthy cross-examination upon these points, and Ellis was asked whether he had ever told anybody about it, and the witness said he had told his wife and daughter. The wife and daughter were not called as witnesses to bolster up the testimony of Ellis upon this point, but the prosecution did undertake to put such statement in evidence upon the direct examination of the witness D. Edward Collins, and the court, upon motion of the plaintiff in error, ruled that such testimony was inadmissible. The United States attorney, in his opening argument to the jury, referred to the imputations which had been cast by counsel upon Ellis, and remarked, in substance, that, if counsel had desired to press the inquiry so as to ascertain the truth of the statement made by Ellis that he had reported on the following morning to his wife and daughter the occurrences at the mint on the night of March 18th, he could have called

the wife and daughter as witnesses, and have questioned them as to whether or not such statements had been made; and further said that the prosecution was unable, in view of the ruling of the court upon the offered testimony of the witness Collins, to call the wife and daughter. The court thereupon promptly said that counsel had no right to make the reference to the question objected to and ruled out, and informed the jury that there was no evidence in the case that Collins knew anything about the matter. We are not called upon to answer the question whether the court ruled correctly in refusing to allow the question asked of Collins to be answered. The ruling was in favor of the plaintiff in error. We are here dealing solely with the remarks of counsel, which are claimed to be such "gross misconduct" as to justify this court in reversing the case on the ground that the plaintiff in error did not have a fair and impartial trial. This charge is made not only against the remark of the United States attorney, but also against the associate counsel for the prosecution. The associate counsel, in his remarks, claimed that the counsel for the plaintiff in error "had made an unfair argument to the jury," in this: that he had argued against Ellis; that he reported the transaction which occurred on the night of March 18, 1901, to his wife and daughter, and then was "silent evermore." The associate counsel, in replying to the argument of counsel for the plaintiff in error, among other things said:

"Counsel for Dimmick told you here yesterday that Ellis reported this thing to his wife and daughter, and then he was silent evermore. A more baseless misrepresentation was never uttered to a jury. Is it true that he was silent evermore after he had reported this occurrence to his wife and daughter? * * * Did Dimmick's counsel ask Ellis, 'Were you silent evermore after you spoke to your wife and child?' * * * Gentlemen, I am dealing here with the cross-examination of Ellis, and I am dealing here with the perverted statement made to you yesterday that after he reported to his wife and daughter he was silent evermore. Who says he was silent evermore? Dimmick's counsel; who had it in the hollow of his hand to prove out of Ellis' testimony, if it were the fact, that he was silent evermore. Why did he not ask him? Why did he not prove it, instead of standing here before you and perverting the truth and the fact about Ellis, and telling you that after Ellis reported to his wife and daughter he was 'silent evermore'?"

Taking all the facts in relation to this matter into consideration, we are unprepared to say that the remarks of counsel were wholly uncalled for, or made for the purpose of prejudicing the rights of the accused. The first portion of the remarks of the United States attorney was a proper comment upon the course pursued by the opposing counsel; and when he commented on the fact that certain testimony had been ruled out the court informed him that he had no right to refer to this matter, and that was the end of it. The remarks of the associate counsel questioned the truth of the statements made by the opposing counsel. Counsel for the accused had challenged counsel to answer his argument, and counsel accepted the challenge. Counsel for plaintiff in error ought not to complain because counsel for the government accepted his challenge and replied to it.

In Crumpton v. United States, 138 U. S. 361, 363, 11 Sup. Ct. 355, 34 L. Ed. 958, testimony had been offered to implicate one Burt as the criminal agent in the commission of the crime of murder. Dur-

ing the argument of the case the defendant's counsel said to the jury:

"Either the defendant or Burt is guilty of this crime. I will show you that Burt is guilty, and therefore that defendant is not."

In reply to this, the District Attorney, in his closing argument, said:

"The issue is squarely made by Mr. Neal that either the defendant or William Burt is guilty of this crime. I have shown you that Burt is not guilty; therefore, by his logic, the defendant is guilty."

The court said:

"In the present case it is by no means clear that the District Attorney transcended the proper limits of an argument. Counsel for the defendant had tendered the issue to the jury that either his client or Burt was guilty of the crime, and we perceive no impropriety in the District Attorney accepting the challenge, and attempting to demonstrate that Burt was not guilty, and arguing that the jury, upon the issue thus presented, had a right to infer that the defendant was guilty."

In Siberry v. The State, 133 Ind. 677, 682, 33 N. E. 681, 682, the arguments of counsel for the state, which were claimed to be improper and prejudicial, were made in answer to the argument of counsel for the defendant in relation to the absence of Mr. and Mrs. Campbell as witnesses. The court said:

"It would seem that counsel for the defense, in their argument, desired to base their defense, or gain some advantage for their client, on some supposed testimony of the Campbells, or some fact in relation to the Campbells not before the jury, and stepped outside the bounds of legitimate argument to discuss the absence of the Campbells, and their supposed knowledge of the case; and that counsel for the state felt called upon to answer it, and did so. * * * This mode of conducting an argument in either a criminal or civil case is to be condemned; but when counsel for the defense step outside the bounds of the case, and indulge in the discussion of matters not before the jury, and thus pursue a line of illegitimate argument, it comes with ill grace and with poor favor to ask the court to restrain opposing counsel from answering such illegitimate argument, and prevent them from clearing away the rubbish illegitimately brought into the case, and casting it out that it may not mislead the jury. * * * It is immaterial to determine whether the statements of counsel were strictly within the bounds of legitimate argument or not. As the door was opened for it by counsel for the appellant, they cannot complain if counsel for the state' walked in at the door which they had opened."

As was said by the court in Pierson v. State, 21 Tex. App. 14, 60, 17 S. W. 468, 471:

"If the defendant wishes to invoke the rule of confinement to the record, they, themselves, must keep within the record. When they voluntarily go outside, they at least invite, if they do not render it necessary, that the prosecution should follow."

6. In answer to the claim that counsel for the government were guilty of gross misconduct in asking the question of Collins, knowing it to be improper, and that the object was simply to improperly prejudice the plaintiff in error, it cannot, we think, be said that counsel were guilty of misconduct in asking the question. The decided weight of authority unquestionably is that proof of declarations made by a witness out of court, and not under oath, is inad-

missible. But, without questioning the ruling of the court below in excluding Collins' testimony, there are exceptions to the general rule which would tend to justify counsel in asking the question in the light of all the circumstances in the case. The exception mentioned in the books is that witnesses may testify as to statements made to them by a witness who has been charged with testifying under the influence of some motive prompting him to make a false statement. It may be shown that he made similar statements at a time when the imputed motive did not exist, or when motives of interest would have induced him to make a different statement of facts. It may, in contradiction of evidence tending to show that the witness' account of the transaction was a fabrication of a recent date, be shown that he gave a similar account, before its effect and operation could be foreseen. State v. Flint, 60 Vt. 304, 316, 14 Atl. 178; State v. Petty, 21 Kan. 54, 60; People v. Doyell, 48 Cal. 86, 91; Stolp v. Blair, 68 Ill. 541, 544; Herrick v. Smith, 13 Hun, 446, 448; Railway Co. v. Knee, 83 Md. 77, 79, 34 Atl. 252. If counsel for Dimmick offered any testimony to sustain the charges he makes in his brief that the testimony of Ellis was false and fabricated, Collins' testimony might have been admissible. But, whether admissible or not, the asking of it seems to have been more an act of "good faith" than of "willful misconduct."

In People v. Ward, 105 Cal. 335, 340, 38 Pac. 945, 946, the court discussed the character of cases which would justify a reversal on the ground of alleged improper remarks of counsel, and said:

"There seems a disposition on the part of counsel for defendants in all criminal cases since the decision in People v. Wells, 100 Cal. 459, 34 Pac. 1078, to count upon the alleged misconduct of the prosecution as cause for reversal. That was an extreme case, in which this court was of opinion the assistant district attorney had willfully and persistently offered incompetent evidence to the prejudice of defendant, well knowing its inadmissibility. The animus of the prosecution there was so apparent, and its effect so pronounced, that the court deemed it but just to stamp with the seal of its disapprobation, not only for that case, but as a warning against like conduct in other cases, a course of proceeding militating against justice and the fair and orderly conduct which should characterize judicial proceedings in criminal cases. It is only in extreme cases, of which this is not one, that the remedy there administered applies. The attack in that case was not upon error by the prosecution, but upon willful error persisted in for an illegitimate purpose, followed by injustice to the prisoner."

See, also, People v. Gordan, 103 Cal. 568, 573, 37 Pac. 534; People v. Smith, 134 Cal. 453, 457, 66 Pac. 669.

7. It is further argued that the plaintiff in error did not have a fair and impartial trial, in this: that he was prejudiced in his rights by the efforts of counsel for the prosecution to show that he had been convicted of other offenses in relation to the mint not charged in the indictment, and that matters had been stated by counsel for the prosecution that were not borne out by the evidence in the cause. Touching all these matters, we are of opinion that no prejudicial error occurred; that the rights of the plaintiff in error were carefully guarded by the rulings and instructions of the court in relation thereto. The record shows that the plaintiff in error requested an instruction on the question of other offenses not men-

tioned in the indictment, with which the evidence showed him to have been connected, and also requested an instruction that the plaintiff in error had not been convicted of a felony or of an infamous crime "affecting his credibility as a witness." The court, in its charge to the jury, said:

"There was introduced in evidence the record of the conviction of the defendant in this court of two offenses of willfully failing to make deposit with the Assistant Treasurer of the United States at San Francisco within the time required by the Secretary of the Treasury and the Director of the Mint certain moneys belonging to the United States and in his possession as chief clerk of the United States Mint at San Francisco. This judgment of conviction has not become final, because the case has not been finally disposed of by the Circuit Court of Appeals upon writ of error, and you will therefore disregard these convictions; that is, you will not consider them for any purpose whatever. There was also introduced in evidence the record of the conviction of the defendant in this court of the offense of presenting for payment to the cashier of the United States Mint at San Francisco a false, fictitious, and fraudulent claim against the United States in the sum of $498.37, and also the record of the conviction of the defendant for using $498.37 of the money of the United States for a purpose not prescribed by law, to wit, for his own use and purpose, in violation of section 5497 of the United States Revised Statutes. Neither of these offenses is a technical felony. They are, however, grave offenses, for which the law provides an infamous punishment, and the latter offense is declared by the statute to be an act of embezzlement of public moneys. I now charge you that you cannot consider the defendant's conviction of the offenses just referred to for any other purpose than to determine his credibility as a witness; that is, you can only consider his conviction of these offenses in weighing his testimony and reaching a conclusion as to the degree of credit to which it is entitled. These convictions cannot be considered by you as evidence that the defendant is guilty of any offense charged in this indictment, but can be considered by you solely for the purpose of passing upon his credibility; and to what extent, if any, his credibility is affected by these convictions, is a question solely for your consideration. * * * You are further instructed that you must carefully exclude from your minds in the consideration of this case all of the evidence and testimony that the court has ordered stricken out, and all that it has refused to admit. You must not permit such evidence or offered testimony to in any manner whatever influence your judgment or your views in arriving at a verdict, and you are further instructed that you must carefully exclude from your consideration all matter or matters appertaining to any other charge or charges that are contained in the indictment in this case * * * Statements of counsel are not evidence, and should not be so considered. Offers to prove certain alleged facts, which may have been made in your presence, are not evidence, and you should not take the same into consideration, nor allow yourselves to be in any manner influenced thereby."

8. Did the court err in refusing to give the instructions requested by the plaintiff in error? No exception was taken to the charge of the court, nor to any specific part thereof, except in a general way to take exceptions to all instructions that were modified or refused. We have repeatedly stated that:

"The rule is well settled that the court is never required to give instructions in the language used by counsel. The duty of the court is always fully discharged if its charge embraces all of the principles of law arising in the case, in the court's own language." Mountain Copper Co., Ltd., v. Van Buren (C. C. A.) 133 Fed. 1, 7, and authorities there cited.

See, also, People v. Dodge, 30 Cal. 448.

The charge of the court not only covered every legal point involved in the case, but was in all respects clear, and the language

used was as strong and favorable in favor of the defendant as the law would warrant, and bears evidence that the court in its charge carefully guarded the rights of the plaintiff in error.

The judgment of the District Court is affirmed.