## WELLS v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. December 7, 1925.)

No. 4649.

**1. Post office ⟳49—Evidence held to sustain conviction for use of mails to defraud.**

Evidence *held* to sustain conviction, under Penal Code, § 215 (Comp. St. § 10385), for use of mails in furtherance of scheme to defraud.

**2. Criminal law ⟳1169(5)—Admission, without limitation, of evidence competent only as to certain defendants, if error, held not prejudicial, being subsequently stricken.**

In prosecution, under Penal Code, § 215 (Comp. St. § 10385), for use of mails in furtherance of scheme to defraud by sales of undivided interests in oil enterprise, admission, without limitation, of evidence competent against part of defendants only, *held*, if error, harmless, in view of subsequent striking out of such evidence after close of government's case.

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Paul J. McCormick, Judge.

S. M. Wells was convicted for violation of Penal Code, § 215, and he brings error. Affirmed.

Paul W. Schenck and Richard Kittrelle, both of Los Angeles, Cal., for plaintiff in error.

Samuel W. McNabb, U. S. Atty., of Los Angeles, Cal., and David H. Cannon and H. L. Arterberry, Sp. Asst. Attys. Gen., for the United States.

Before HUNT, RUDKIN, and McCAMANT, Circuit Juges.

HUNT, Circuit Judge. Writ of error to review conviction of Wells for violation of section 215 of the Penal Code (Comp. St. § 10385).

The substance of the charge was that about March 3, 1922, Wells and others, indicted and convicted, were to form a partnership for the purpose of acquiring and holding certain acreage and two town lots; that they were to organize a trust called the Co-operative Oil Syndicate of Santa Fé Springs; that the trust agreement was to provide that each partner should own a one-sixth interest in the land, title to be in two persons (also defendants) as trustees; that the property was to be divided into 5,000 undivided interests, to be sold to the public for $100 each, deeds to be given to the purchasers, the syndicate reserving 25 per cent. of all oil, upon the false pretense, representation, and promise that many wells would be drilled on the property, whereas defendants did not intend to drill many wells, but only one; that, as a further part of the scheme for the purpose of inducing persons to buy, there were to be false representations and promises by means of lectures and letters to be sent through the United States mail; that "victims" were buying undivided interests in the lands, together with 75 per cent. of all oil thereon, less only slight charges for operating expenses; that certain part of the property was in close proximity to the two town lots and within the producing area of the Santa Fé Springs oil field; that many wells were to be drilled, expenses thereof to be paid out of the proceeds of the sale of units; that the only operating expenses to be deducted from the 75 per cent. were the salary of an oil gauger and a fee to the bank for issuing dividend checks; that, if purchasers would make the trustees their attorneys in fact, their interests would be safeguarded; that dividend checks would be mailed by a certain designated bank in Los Angeles; and that no charge would be made by the trustees for acting as attorneys in fact.

It is alleged that defendants well knew that 75 per cent. of all oil would not be given to purchasers of units; that excessive charges classed as operating expenses, would first be deducted; that defendants well knew that five acres of the tract of real estate were more than two miles from certain town lots described and that they were not within the producing area of the Santa Fé Springs or any other oil field; that defendants knew that they did not intend to drill more than one well, and well knew that, in addition to the gauger's salary and the bank fee, there would be salaries of the trustees, general salaries and expenses, and excessive well-drilling expenses to be deducted from the 75 per cent., and well knew that the trustees with power of attorney did not intend honestly to safeguard the interests of holders, but intended to appropriate and embezzle the larger portion of the oil belonging to the victims under the pretense that such embezzlement constituted legitimate and authorized operating expenses; that defendants well knew that it was intended to appropriate a large portion of the oil and convert the proceeds to their own use and benefit, and never intended that dividend checks would be mailed by the bank, and well knew that the trustees intended to retain money from the sale of 75 per cent. of the oil for their own use and benefit under color of salaries paid to themselves for acting as attorney in fact.

It is charged that, to carry out the scheme, a deed was executed, dated May 29, 1922, by defendants Ferdon and Vurpilatt, to Mrs. Rose Cullinan, conveying an interest in the real estate of the syndicate, and mailed on April 4, 1922, and that a letter, dated May 16, 1922, signed by Ferdon and Vurpillat as trustees, addressed to Nell E. Strong, Los Angeles, was sent through the mail. This letter, among other things, contained such tempting representations as "one large gusher came in on the 8th of this month, one block from our property"; also, that drilling would begin in May and pushed with speed. The letter closed by requesting prompt payment of balance due on or before May 22, 1922, as addressee's contract would "otherwise be forfeited."

[1] The first question presented by Wells goes to the sufficiency of the evidence to sustain the verdict. There was ample evidence to require submission to the jury of the question whether there was a scheme or artifice to defraud. Witnesses testified that false representations and promises were made to persons to induce them to purchase units in the syndicate; that during the spring and summer of 1922 lectures were given whereat figures were used in impressing "victims" with the belief that large returns would be received from investment in the units. A balance sheet introduced in evidence showed that less than $125,000 was spent in drilling the well; that of $500,000 received from the sale of units, commissions of $179,000 were paid to salesmen; that syndicate money was spent for bus hire and free lunches to "victims"; and that, after such items, all classed

as expenses, were paid, there remained a net profit of $129,050 during the first four months of the selling campaign. It was also in evidence that, prior to August 31, 1922, each defendant received $17,500 from the proceeds of sales of units and 34 units of the syndicate, of the value of $100 each, this before the well was brought to the production stage; that only one well was drilled on the five-acre tract; that it was announced by one of the defendants during a lecture that the company would take the oil and turn it over to the bank, and that defendants had nothing to do with handling the money, and that the bank would charge but 25 or 50 cents for handling the money; that the document and letter described in counts 1 and 2, respectively, under which Wells was convicted, were sent through the mails.

As tending to implicate Wells, there is evidence that he was present in the spring of 1922, when the contract for drilling the well was made; that he was also present at a subsequent meeting of those in charge of the syndicate; that in May or June, 1922, he participated in a discussion of the division of profits from a sale of some units to one Stephenson, and that defendants Ferdon and Vurpillat then told the witness they had to pay Wells one-half of 1 per cent. commission on all sales; that Wells was often at the tent where lectures were given; that Wells received $17,500 in cash and 34 units, as did the other defendants; that of $4,000 profit, made by a witness as the result of a sale of some units, division was made with Wells and one other defendant; that Wells signed and acknowledged the declaration of trust dated March 3, 1922; that he was in the office of the company from its organization until the latter part of June, 1922, and showed Ferdon, a son of one of the defendants, who went to work in the office, the routine of the work; that he interviewed people who came to the office to inquire concerning the well, gave orders to stenographers, and generally supervised the details of the office. One purchaser testified that, after she bought some units, she talked with Wells, both in the field and in the office; that before she received her deed, which was in May, 1922, she asked Wells to return her money, but that he assured her everything was all right, and that she would be foolish to take her money back. Wells did not testify.

[2] Error is assigned upon a ruling of the court in admitting testimony of several persons to the effect that, shortly before they purchased units in the Co-operative Syndi-

cate, they bought interests in other oil ventures promoted by some of the defendants other than Wells. Such evidence, though not admissible as against Wells, was competent against the other defendants. But, as counsel for Wells admits that at the close of the government's case the court granted a motion to strike out that evidence, any possible prejudice by not limiting the relation of the testimony was cured. Pennsylvania Co. v. Roy, 102 U. S. 451, 26 L. Ed. 141; Dimmick v. United States, 135 F. 257, 70 C. C. A. 141; Krause v. United States, 147 F. 442, 78 C. C. A. 642; Francis v. United States, 152 F. 155, 81 C. C. A. 407; Remus v. United States (C. C. A.) 291 F. 501; Hill v. Wabash R. Co. (C. C. A.) 1 F.(2d) 626.

This disposes of the principal assignments of error. We have carefully examined the others, however, and find no prejudice to the rights of the plaintiff in error.

The judgment is affirmed.