STATE OF IOWA v. JAMES MINOR, CHARLES FARLOW, and FRANK FARLOW, Appellants.

Larceny: EVIDENCE.  Soon after an owner missed a steer, one similarly marked, appeared in a certain pasture, where it remained until a certain day, during which it was seen to stand near a spot where the entrails of a steer were afterwards found.  A gun shot was heard on that day, and fresh wagon tracks and mule tracks passed by the entrails, and led to and from the home of one of the defendants, and defendants were about the pasture about the same time. The tracks showed that one of the mules had a broken hoof, similar to a hoof of one of defendant's mules.  Next day fresh steer meat was found in defendant's smoke house.  *Held,* sufficient to sustain a conviction for larceny.

SAME.  There was evidence that defendants killed another's steer, and fresh meat was found in defendant's smoke house.  Defendant testified that the meat came from a steer of his own.  *Held,*

proper to refuse to charge to acquit if the jury found that the meat came from his steer, as such fact was not necessarily inconsistent with his guilt

CORPUS DELICTI.  The *corpus delicti* of larceny may be established by circumstantial evidence.

INSTRUCTIONS.  A charge that an intent to appropriate another's property is an ingredient of larceny is not erroneous, as failing to state that the intent must be "felonious."

SAME.  Where defendant, accused of larceny, denies taking the property, a failure to define the intent of taking more fully than to state that accused must have intended to appropriate the property to his own use is harmless.

SAME: *Imp· achment,*  An instruction to reject the evidence of witnesses if their testimony is not believed, is proper.

MISCONDUCT OF JUROR.  The mere fact that a material prosecuting witness treated two of the jurors to beer, in a saloon, before any deliberation on the verdict was commenced, is not sufficient to show that the jurors were guilty of misconduct.

Talesman:  OBJECTION BELOW.  An accused's objection that the first appearing talesman, drawn under Code, section 349, was called to the jury box, without reference to the order in which names were drawn from the talesmen box, is waived, if not made before the jury is accepted.

*Appeal from Harrison District Court.*—HON. GEORGE W. WAKEFIELD, Judge.

WEDNESDAY, DECEMBER 14, 1898.

THE defendants were indicted and convicted of stealing a steer, and appeal.—*Affirmed.*

*S. H. Cochran* for appellants.

*Milton Remley,* Attorney General, and *W. H. Redman* for the State.

LADD, J.—Falk purchased forty-six steers at Nickerson, Neb., and brought them past the Dray pasture to his farm, in Harrison county, in April, 1896.  One of these (a white-faced, red, two year old steer, with right horn lopping to the

right eye, and brands not especially noticed at the time) disappeared about June 15th of the same year. At about the same time a stray steer, of like description, with brands identified as a "pick" and a "U," appeared in the Dray pasture, and .continued there till Sunday, October 4th. It was last seen between 4 and 5 o'clock P. M. of that day, within 300 feet of where the entrails of a steer were discovered the next day. One Granger was through the pasture near this locality earlier Sunday afternoon, and did not notice entrails at that time. A gunshot was heard by King from that direction at about 5 o'clock. The tracks of a wagon and team of mules standing were observed near by. These indicated that a piece of the right forefoot of the near mule, about one and one-half inches long, was broken from the outside and front quarter. The tracks of this team and wagon were traced one and one-half miles to the gate of the pasture at the Blair bridge, and from there more than that distance past the house of Jeff Minor, to and from the locality of the entrails. Rain fell shortly after 5 o'clock Sunday, and the difference in these tracks indicated that those leading to the entrails were made before the rain, and those therefrom afterwards. Other mule teams had been in the pasture that day,—one with a defective foot,—but had left through the east gate, near Dray's house. Several witnesses testify to the tracks; and whether, owing to the character of the soil, they could be observed, was a question for the jury. The defendant James Minor had three colts and a mule in this pasture, and had been there to see them on each of the three Sundays previous. He and the other defendants started there, by way of the house of Jeff Minor, on the fourth of October, and left the latter's place, in the direction of the Blair bridge, for that purpose, about 4 o'clock in the afternoon. They testify that, owing to the appearance of a dark cloud in the west, they were apprehensive of a storm, and drove on without entering the pasture. The evidence tended to show that on Tuesday the feet of the mules then driven by Minor were measured, that a piece was gone from the right forefoot of the near mule, and that these

corresponded with the tracks. At the same time one hundred and thirty-two pounds of fresh meat were found in his smoke-house, one hundred and seventy-five pounds in a tub in the second story of Frank Farlow's house, and eight or ten pounds at Chance Farlow's home. All this meat had been recently salted down, and was shown by a butcher to be from a steer. On the part of the defense it was claimed: That James Minor killed a two year old crippled steer, belonging to himself and mother, October 2d, and sold the one hundred and seventy-five pounds of meat to Frank Farlow in payment of a debt, and that at the home of Chance was purchased by his brother. That delivered to Frank was not weighed, nor was the price agreed. Dogs had carried away the head and hoofs of the steer, and a Jew peddler received its hide in payment for trousers. Whether the mother and James had such a steer in 1896 is put in issue by the evidence. One witness testified that she saw defendants near home between 5 and 6 o'clock P. M. Sunday, but the impeaching evidence was such that the jury might have rejected her story. It may also be added that the traditional tall and short man were seen along the river in this pasture, with a Winchester rifle, and a dead red steer on the sand bar. We have found it necessary to set out the evidence somewhat in detail, in order to pass upon the points raised by the appellants.

I. The circumstances all point to the killing of the stray steer October 4, 1896, at about 5 o'clock in the afternoon. It was last seen after 4 o'clock, near where the entrails of a steer were found the next day. The sound of a gunshot was heard from there within an hour. The team and wagon were there at about that time. The mark of the broken hoof of the mule, similar to that of Minor's, going before the rain and returning afterwards; the fall of the rain shortly after 5 o'clock; the defendants' purpose of going to the pasture at that time; and all confirmed by their possession of the meat of a steer,—war-ranted the jury, if believed, not only in finding the particular steer was killed, but that these defendants did the killing, and appropriated the meat to their own use.

II.    The steer was peculiarly marked by the drooping horn and white face.    Falk and his employes noticed brands, but not their character, while Dray observed that of a "pick," and also "U."   It disappeared from Falk's farm at about the time it appeared in Dray's pasture, which was near the road it had been driven when brought from Nebraska.    The positive identification of animals is always a matter of some difficulty, but we are of the opinion that the similarity in the description and size, when considered in connection with the other circumstances, was such that the identity of the steer killed as that of Falk might well be left to the judgment of the jury.

III.    Whether the *corpus delicti* may be established by circumstantial evidence is not an open question in this state. *State v. Keeler,* 28 Iowa, 551; *State v. Millmeier,* 102 Iowa, 692.    Counsel seem to have confused this with the mooted question mentioned in *State v. Clemons,* 51 Iowa, 277, which is whether, "where a party is sought to be convicted upon circumstantial evidence alone, the evidence of the circumstance relied upon must be direct, and not circumstantial."

IV.    "Larceny" is thus defined in paragraph 4 of the court's charge:   " 'Larceny' is the felonious taking of the property of another without the knowledge or consent of that other, and with the intent of the party taking, at the time of the taking, to permanently deprive the owner thereof, and with the further intent at said times to wholly and permanently appropriate it to the use of the party taking."   It is said the word "felonious" should have been used in describing the intent.    The virtue of this instruction is in explaining to the jury just what constitutes the felonious intent in taking, without employing that word in doing so.    See *Georgia v. Kepford,* 45 Iowa, 51.    In paragraph 5 the elements of the crime are set out, and the third part, relating to the intent, was as follows:   "That said defendants took said property with intent at the time of taking

to wholly and permanently deprive the owner of it, and to permanently appropriate it to the use of defendants, or some of them." It will be noticed that the word "felonious" was not used as describing the intent, nor is the taking required to be without the knowledge or consent of the owner. But the court, as seen, had so indicated in the instruction quoted. We have often held that all instructions must be considered together. In this case the defendants denied all taking or knowledge of the steer alleged to have been stolen, and we think that the omission to more fully define the intent of the taking required was wholly without prejudice to the defendants. The criticism of the sixth instruction is without any foundation whatever. The court did not instruct the jury to reject the evidence of witnesses, if found to be impeached, but simply that, if the jury believed their testimony untrue, they might reject it. Again, complaint is made because the court refused to instruct the jury that, if the meat found was from a steer belonging to James Minor, the defendants were entitled to an acquittal. The fact, if so found, would have been a strong circumstance in favor of the defendants, but not inconsistent with their guilt.

V. Complaint is made of misconduct on the part of some of the jurors and the officers in charge. One Wilson was a material witness for the state, and it is shown by affidavit that on the evening of November 10, 1897, he treated two of the jurors to beer at a saloon in Logan. Whether this was during the progress of the trial, or after its conclusion, we have no means of knowing. We are satisfied, however, that it was not while the jurors were deliberating on their verdict. No other intimacy between Wilson and these jurors is shown. While we are not prepared to say that, under some circumstances, the taking of intoxicating liquors by jurors from a witness might not be such misconduct as to render a new trial necessary, the mere indulgence in this social custom, without anything more, will not warrant the inference of any wrong-doing. See State v. Bruce, 48 Iowa, 530; State v. Livingston, 64 Iowa, 560. The conclusion of the lower court that

the jurors were properly cared for by the officers when delib-
erating upon their verdict is fully substantiated by the affi-
davits filed.

VI.    The regular panel of jurors having been exhausted,
talesmen were drawn, as provided in section 349 of the Code.
The one first appearing in court was called to the jury box, and
this without reference to the order in which names were
drawn from the talesmen box. No objection was made by the
defendants, and it is now argued that talesmen should be called
to the jury only in the order drawn from that box. The sec-
tion referred to is in part as follows: "In drawing such
names, the clerk, when the court directs, shall reject those
known to be unable to serve or absent from the territory from
which drawn, and proceed until the required number is
secured. The persons whose names are so drawn, or as many
thereof as may be found within the territory, from which tales-
men are selected, shall be immediately summoned by the
sheriff to appear forthwith, and the jury shall be completed
from the persons so summoned and appearing. The names
of jurors so drawn, and who serve, shall be placed in a safe
receptacle from time to time until all the ballots are drawn
from the talesmen's box, when such ballots shall be returned
to the said box, to be drawn in like manner as before." It will
be observed that the statute does not in direct terms require
talesmen to be called to the box in the order drawn. Usually
a sufficient number are drawn and summoned to meet the
requirements of the particular case. To procure one at a
time would occasion inexcusable delay. The statute relating
to the manner of procedure by public officers, where no nega-
tive words are used, are generally construed as directory.
*Dishon v. Smith,* 10 Iowa, 212; *Parish v. Elwell,* 46 Iowa,
162. A challenge to the panel must be exercised before a
juror is sworn. Code, section 3680. The drawing of tales-
men is in open court, and subject to the inspection of all par-
ties. The defendants were as well advised (or, by giving atten-
tion, might have been) as the court of the method pursued. It

was their duty to urge any objection to the drawing or summoning of talesmen before the jury was accepted, and, having failed to do so, they will be deemed to have acquiesced in the method pursued.  See *State v. Pickett,* 103 Iowa, 714.

AFFIRMED.