City of Des Moines, Appellant, et al., Interveners, v. Manhattan Oil Company et al., Appellees.

CONSTITUTIONAL LAW: Restricted Residence Act. The Restricted Residence Act and municipal ordinances enacted in harmony therewith are not subject to the constitutional objections:

1. That the citizen is deprived of his personal liberty and property without due process of law.

2. That private property is taken for public use without compensation.

3. That the privileges and immunities of the citizen are unduly abridged.

4. That citizens are denied the equal protection of the law.

5. That private property is taken for private use without compensation.

6. That legislative power is delegated to private persons.

MUNICIPAL CORPORATIONS: Power of Council—Rescinding Action. A building permit granted by a city council may be revoked, when no one has materially changed his position by reason of the granting of the permit.

CONSTITUTIONAL LAW: General Scope of Police Power. The police power of a state embraces not only matters and things which at common law constitute nuisances *per se,* but matters and things which are not *inherently wrong,* or which pertain solely to *public convenience and general prosperity,* even though the regulations imposed do restrict individual rights.

EMINENT DOMAIN: Nonrecoverable Compensation. A property owner is not entitled to compensation for the *incidental* loss or in-

jury which he may sustain by reason of the enforcement of a valid police regulation, e. g., the Restricted Residence Act.

**CONSTITUTIONAL LAW: Police Power—Unreasonable Regulations.**
5   The restrictions upon the use of property imposed by the Restricted Residence Act and municipal ordinances in accord therewith are not *unreasonable*, in a constitutional sense, because said act and ordinances:

  1. Do not provide for *notice* to the property owner.

  2. Make no provision for compensation to the property owner.

  3. Declare an otherwise lawful act a nuisance, and impose punishment accordingly.

  4. Allow a trifling minority of residents to *initiate* a district.

  5. Vest the council, or 60 per cent of the property owners, with power to prescribe the limits of the district.

**CONSTITUTIONAL LAW: Police Power—Use of Property.** Principle
6   reaffirmed that reasonable regulation of the use of property *within cities and towns* is peculiarly within the range of the police power of the state. Applied in the construction of the Restricted Residence Act.

**CONSTITUTIONAL LAW: Necessary Showing of Unconstitutionality.**
7   Principle recognized that a legislative act will not be declared unconstitutional unless such vice is so palpable as to leave no reasonable doubt on the subject.

**CONSTITUTIONAL LAW: Construction—In Favor of Constitution-**
8   **ality.** A constitutional grant of legislative power to a *municipality* will not be nullified by the presence in the same act of an unconstitutional grant of power to a portion of the citizens of the municipality, when the latter grant can be wholly eliminated from the act.

**CONSTITUTIONAL LAW: Construction—"Shall" as Permissive**
9   **Term.** The term "shall" may be construed as "may," in order to avoid unconstitutionality. So held where the Restricted Residence Act, which provided that "cities * * * may, and upon petition of 60 per cent of the owners of the real estate in the district * * * shall, * * * establish * * * restricted residence districts," was held to grant nothing more than a discretionary power.

*Appeal from Polk District Court.*—Lawrence De Graff, Judge.

October 27, 1921.

Supplemental Opinion June 23, 1922.

THE opinion sufficiently states the case.—*Reversed.*

*C. W. Lyon, Edwin J. Frisk, Chauncey A. Weaver,* and *Russell Jordan,* for appellant.

*N. E. Coffin* and *D. Cole McMartin,* for appellees.

*Stipp, Perry, Bannister & Starzinger, Amici Curiae.*

*Blake & Blake,* for interveners.

WEAVER, J.—Suit in equity by the city of Des Moines, to enjoin the defendants from the erection and maintenance of a gasoline and oil filling station upon certain property owned by the defendant Macomber, and leased by him for that purpose to his codefendants, Manhattan Oil Company and J. P. Howe. In support of plaintiff's demand for injunctive relief, it is alleged that the property in question is within a restricted residence district, established by the city under authority of Chapter 138, Acts of the Thirty-seventh General Assembly, and further, that the maintenance of such gasoline and oil filling station and the carrying on of said business will be detrimental to the health, comfort, and general welfare of the people making their homes in said district, and unless enjoined, as prayed, will constitute a nuisance.

1. CONSTITUTIONAL LAW: Restricted Residence Act.

The defendants deny the constitutional validity of the statute above cited, as well as of the city ordinance purporting to establish the restricted district, and deny that the maintenance and operation of the proposed station will create a nuisance. Other matters are pleaded, which will have our attention in the progress of this opinion.

Before the cause came on for trial, the Cottage Grove Avenue Presbyterian Church, together with several other owners of property in the district, intervened, and united with the plaintiff in its prayer for an injunction. There was a trial to the court, which found for the defendants and dismissed the petition, and plaintiff appeals.

It appears without controversy that, on or about September 8, 1919, a movement was begun by resident property owners

within the area bounded by Twenty-fourth Street, Twenty-fifth
Street, School Street, and Kingman Avenue, in the city of Des
Moines, to have the same made a restricted residence district,
as provided in the statute already mentioned. .A petition ad-
dressed to the mayor and council of the city was prepared,
signed by 12 of the 14 property owners within the specified
area, asking to have the district established. The petition was
filed with the city clerk on September 10, 1919, was in due
course read to the council, and by it was referred to the street
department of the city government. While the matter was thus
pending before the council, the defendant Macomber, having
acquired some sort of contract or arrangement for the purchase
of the lot now in question, entered into a tentative agreement
with his codefendants herein to lease the lot to them for the
site of a gasoline and oil station, such agreement being condi-
tional upon Macomber's procurement from the city of a building
permit for that purpose. Macomber, with knowledge of the
pendency of the application to establish the restricted district,
made application for the desired building permit, and there-
after, on September 19, 1919, the council, without having yet
acted upon the petition of the property owners, passed a resolu-
tion granting the permit; but on September 24, 1919, adopted
another resolution, rescinding it. On October 1, 1919, the coun-
cil enacted the following ordinance:

"An Ordinance Designating and Establishing a Restricted
Residence District, and Providing a Penalty For the Violation
Thereof. Whereas, the general assembly of the state of Iowa
has authorized cities under the commission form of government,
upon petition of sixty (60) per cent of the owners of real estate
in a given district residing in said city, to establish restricted
residence districts; and, whereas, on the 10th day of September,
1919, a petition with the requisite number of signers was duly
filed with the city clerk and presented to the city council, asking
that certain territory between Kingman Boulevard and School
Streets on the north and south, and between Twenty-fourth
and Twenty-fifth Streets on the east and west, be established as
a restricted residence district; now, therefore, be it ordained
by the city council of the city of Des Moines:

"Section 1. That the block bounded on the north by King-man Boulevard, on the west by Twenty-fifth Street, on the south by School Street, and on the east by Twenty-fourth Street, be and the same is hereby designated and established as a restricted residence district.

"Section 2. That no buildings or other structures, except residences, schoolhouses, churches, and other similar structures shall be hereafter erected, reconstructed, altered, repaired, or occupied within said district without first securing from the city council a permit therefor; nor shall any such permit be granted when sixty (60) per cent of the owners of real estate in said district residing in said city object thereto.

"Section 3. Any building or structure erected, altered, repaired, or used in violation of any of the provisions of this ordinance, is hereby declared to be a nuisance, and it is hereby made the duty of the city prosecutor to prosecute all persons violating the provisions of this ordinance with respect to the erection, reconstruction, altering, repairing, or occupying any building or other structure in said district without a permit, and in all cases where the punishment by fine fails to abate the nuisance, he shall cause to be brought in the district court in and for Polk County an action for the abatement thereof. All such prosecutions shall be in the name of the city of Des Moines.

"Section 4. Any person, firm or corporation violating any of the provisions of this ordinance shall be guilty of misdemeanor, and upon conviction, shall be subject to a fine of not less than one dollar, nor more than one hundred dollars for each offense."

There is no dispute concerning the facts thus far related. It further appears in evidence that, at the date of the application to the city council for the establishment of the restricted district, the area included therein was occupied and used exclusively for residence purposes, and was quite generally improved with substantial and comfortable homes. The corner lot in question is at an intersection, from which streets radiate in five directions. Over and upon these streets is a large amount of travel, and the street traffic at this point is often congested to a considerable degree, and collisions and accidents resulting

therefrom have occurred on several occasions. On one corner is a small public park, frequented by children and others for purposes of recreation. Here also is the site of the Cottage Grove Avenue Church, which has a new and valuable house of worship, where its congregations and subsidiary organizations and societies gather for worship and instruction. The district is located at a considerable distance from the main business section of the city; but, as is not unusual in towns of considerable size, there are nearer at hand small business establishments or shops, scattered here and there, where they can find lodgment in or around residential neighborhoods. Of these, the only one which can be said to closely approach the district in question is a building used as a telephone exchange, one block south of the street intersection already described. The business of maintaining the proposed filling station involves the keeping of large quantities of gasoline and oil, and dispensing it in retail quantities to owners and drivers of auto cars. The gasoline is stored in steel tanks of about 1,000 gallons capacity each, which are set in the ground, with tops or covers a little below the surface. The oils are kept in containers above the surface. The method of drawing these articles from their containers and transferring them to the cars of the buyers is a matter of common observation. As is also well known, gasoline is highly inflammable, and a violent explosive. The characteristic smell of gasoline, when exposed, is familiar to everyone. The same is true, though perhaps in less noticeable degree, of lubricating oils. It is the claim of the appellees that their methods of storing, keeping, and handling these substances is not only safe, but is such as to suppress or prevent all disagreeable odors; and that the business may be carried on without becoming a source of inconvenience or discomfort to the inhabitants of the neighborhood, or creating a nuisance, in any proper sense of the word. On the other hand, the testimony on the part of appellant tends to show that the offensive odors created by the conduct of a filling station of this character contaminate and pervade the air in their neighborhood to a marked degree, while the drip of stale oil from motor cars which are being filled, and from others

waiting their turn to be served, befouls the streets and drive-ways.

Plaintiffs also contend that the maintenance of the station and the carrying on of such business will serve to increase the congestion of travel and of vehicles at that point, and accentuate the noise and confusion of ordinary street traffic, to the disturbance of the inhabitants, as well as of the church congregations.

Other matters are mentioned in the testimony, but the foregoing is sufficient to indicate the nature of the controversy and to give point to the arguments of counsel on either side. The trial court found for the defendants, and dismissed the petition.

For the appellees, counsel have directed their principal argument to the proposition that the city ordinance establishing the restricted residence district and the statute purporting to authorize such action are void, as being in violation of the guaranties of the Constitution of our state and of the Constitution of the United States. It is also contended that the city council, having once adopted a resolution granting a building permit, is without power or authority to rescind it.

I. Referring first to the last proposition above mentioned, we are disposed to hold that the adoption of the resolution to grant the building permit did not have the effect to confer upon the property owner or his lessees a vested right which could not be canceled or recalled, under the circumstances here shown. The lessor had not yet acquired title to the property, and did not acquire it until after the permit had been rescinded. The proposed filling station had not been constructed, though it is claimed that certain material intended for that use had been deposited there. When the application for permit was made, there was then pending and undisposed of before the council, as the applicant well knew, the petition of the property owners within this area to make it a restricted residence district; and if the council, having adopted the resolution to grant the permit under such circumstances, concluded that it had acted inadvertently or improvidently, or without proper regard for the rights of the petitioners for a restricted district,

2. MUNICIPAL COR-PORATIONS: power of council: rescinding action.

and rescinded the resolution with reasonable promptness, we are of the opinion that it did not exceed its authority or abuse its discretion. *City of Salem v. Maynes,* 123 Mass. 372.

II.   Considerable attention has been given by counsel to the proposition that a gasoline and oil filling station is not, at common law, a nuisance *per se.* For the purposes of this case,

3. CONSTITUTIONAL LAW: general scope of police power.

the point thus made may be conceded; but it is by no means decisive of the appeal. Neither the plaintiff city nor the interveners base their claim of right to the relief demanded upon an alleged right to condemn or abate or enjoin a nuisance as at common law, but upon a police regulation authorized and provided for by act of the legislature and the city council. The validity of such legislation is the one question upon which the rights of the parties must turn; and while the prevention of nuisances is a proper and well recognized ground for the exercise of the police power in the interest of the public welfare, it does not bound or limit the scope of such power, as will be seen by reference to the authorities cited in the following paragraph.

III.   We shall not undertake any comprehensive definition of the police power of the state. No such definition has yet been accomplished by any court, nor is it possible or desirable that it should be accomplished. With the changing conditions necessarily attendant upon the growth and density of population, and the ceaseless changes taking place in method and manner of carrying on the multiplying lines of human industry, the demand becomes greater upon that reserve element of sovereignty which we call the police power, for such reasonable supervision and regulation as the state may impose, to insure observance by the individual citizen of the duty to use his property and exercise his rights and privileges with due regard to the personal and property rights and privileges of others. See *Carr v. State,* 175 Ind. 241 (93 N. E. 1071); *State v. Mountain Timber Co.,* 75 Wash. 588. Such duty, even though it involves restriction upon the so-called natural rights of every individual, is the first and most imperative obligation entering into what we call the social compact. Without it there can be no such thing as organized society or civilized government. Naturally,

what regulations may reasonably be required or imposed for that purpose by the constituted authorities vary with the varying conditions with which our lawmakers have to deal; and, subject only to constitutional limitations, the state, acting by its legislature, has the right to select the subjects of regulation and to prescribe rules for making such regulations effective. To justify the exercise of such authority, it is not necessary that the subject thereof shall be inherently wrong; nor is the fact that such regulation may operate to restrict the individual citizen in the use of his own property, or even in his liberty, of itself sufficient to render the regulation or restriction void. 1 Dillon on Municipal Corporations (4th Ed.) 211; *Lawton v. Steele,* 152 U. S. 133; *Barbier v. Connolly,* 113 U. S. 27; *Powell v. Pennsylvania,* 127 U. S. 678; *Welch v. Swasey,* 214 U. S. 91; *Northwestern Laundry v. City of Des Moines,* 239 U. S. 486; *Booth v. Illinois,* 184 U. S. 425.

The power to designate the subject of police regulation rests in the state alone; and if a given statute is not clearly repugnant to some constitutional guaranty, the courts are without power to interfere. Such interference, if tolerated at all, must be on the theory that the subject of the regulation is not within the legislative jurisdiction; or, if the subject be one within such jurisdiction, it must appear to the court that, looking through mere forms, and at the substance of the matter, it can say that the statute, enacted professedly in the interest of the public or general welfare, ''has no substantial relation to that object, but is a clear, unmistakable infringement of 'rights secured by the fundamental law.'' *Booth v. Illinois,* supra; *Overton v. Harrington,* 126 Md. 32 (94 Atl. 325). The legislature, acting within these limits, is the sole judge as to all matters pertaining to the public policy, wisdom, and expediency of the police regulations which it prescribes (*State v. Armour Pkg. Co.,* 124 Iowa 323, 12 Corpus Juris 932); and while the police power is familiarly exercised in regulations to promote the public health and morals, it extends as well to the promotion of ''public convenience and general prosperity.'' *Chicago, B. & Q. R. Co. v. People of Illinois,* 200 U. S. 561, 592.

Bearing these principles in mind, we turn to the question

immediately before us, the validity of the establishment of the restricted residential district heretofore mentioned. Among the powers which have been delegated by the legislature of this state to cities and towns is the enactment of such ordinances as "shall seem necessary and proper to provide for the safety, preserve the health, promote the prosperity, improve the morals, order, comfort and convenience of such corporations and the inhabitants thereof" (Code Sections 680 and 695); "to prevent injury or annoyance from anything dangerous, offensive or unhealthy, and to cause any nuisance to be abated" (Code Section 696); to cause the filling or draining of lots (Code Sections 698, 699); to require "the repair, removal or destruction of any building which is dangerous, or which may be liable to fall" (Code Section 710); "to establish fire limits, and to prohibit within such limits the erection of any building * * *, unless the outer walls be made of * * * noncombustible material" (Code Section 711); "to regulate the transportation and keeping of gunpowder, inflammable oils * * * and to provide or license magazines for storing the same, and prohibit their location or maintenance within a given distance of the corporate limits" (Code Section 714); and "to prohibit or regulate the piling or depositing of any kind of wood, lumber or timber upon any lot * * * within * * * one hundred yards of any dwelling house" (Code Section 715).

There are also many other Code provisions of the same general nature, but the foregoing are sufficient to indicate the breadth and character of the authority conferred upon our municipal corporations.

To these general powers, a recent legislature added the specific authority to cities to establish restricted residential districts. See Chapter 138, Acts of the Thirty-seventh General Assembly. This act, omitting the enacting and publication clauses, is in the following words:

"Section 1. Cities of the first class, including cities under commission form of government, and cities under special charter may, and upon petition of sixty per cent of the owners of the real estate in the district sought to be affected residing in

such city shall designate and establish, by appropriate proceedings, restricted residence districts within its limits.

"Sec. 2. In the ordinance designating and establishing such restricted residence district, every such city is hereby empowered to provide and establish reasonable rules and regulations for the erection, reconstruction, altering and repairing of buildings of all kinds, within said district, as well as the use and occupancy of such buildings; and to provide that no building or other structure, except residences, schoolhouses, churches, and other similar structures shall thereafter be erected, altered · or repaired, or occupied without first securing from the city council of such city a permit therefor, such permit to be issued under such reasonable rules and regulations as may in said ordinance be provided.

"Sec. 3. Any building or structure erected, altered, repaired or used in violation of any ordinance passed under the authority of this act, shall be deemed a nuisance, and every such city is hereby empowered to provide by ordinance for the abatement of such nuisance, either by fine or imprisonment, or by action in the district or municipal court of the county in which such city is located, or by both; such action to be prosecuted in the name of the city."

Following this statute, the city council adopted the ordinance which we have already quoted in full. This ordinance (with a single possible exception, hereinafter noted) appears to be in reasonably strict accord with the provisions of the act, and its validity must be conceded, unless we are compelled to hold that the act itself is void. Counsel for the appellees very strongly urge the unconstitutional character of the act, because it is said to offend against the guaranties of our fundamental law, in that it operates to deprive the defendants of their liberty and property without due process of law; takes private property for public use without compensation; abridges the privileges and immunities of citizens of the United States, and denies them the equal protection of the laws; attempts to make legal the taking of private property for private use without compensation; and assumes to delegate legislative power to private persons. The questions thus raised are of grave im-

portance, and demand careful consideration. The constitutional guaranties invoked by counsel lie at the very foundation of all those rights of person and of property which are the heritage of a free people, associated in a republican form of government,—rights which the courts have no disposition to ignore or fritter away. Nor can the court properly ignore that other settled rule that neither the Constitution nor its amendments were designed to limit the police powers of the state. As was said by Field, J., in *Barbier v. Connolly*, supra, speaking of the fourteenth amendment to the Constitution of the United States:

"Neither the amendment, broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity."

This is not to say that, under the guise of police power, the state may do or authorize that which the Constitution expressly or impliedly forbids; but with that reservation, the authority of the state is supreme. Among those prohibitions is the one which makes private property immune against seizure or condemnation to public use without compensation. It may be taken for that purpose by exercise of the power of eminent domain, only upon making due compensation; but the power of eminent domain is quite distinct from the police power, and for the incidental loss or injury which the individual member of the public may sustain by reason of valid police regulations, no compensation is recoverable. There is in such cases "no divesting of property rights by the operation of the statute, and the regulation to which the exercise of such rights is thereby subjected is not prevented by any limitation upon the authority of the legislature prescribed by the Federal or state Constitution. The interests of the individual are subordinate to the public good, and the constitutional guaranties of the security of private property were not designed and do not operate to prohibit the reasonable restriction of its use by legislation enacted within

4. EMINENT DOMAIN: nonrecoverable compensation.

the sphere of the police power for the promotion of the general welfare." *Overton v. Harrington,* supra; *Mugler v. Kansas,* 123 U. S. 623. Says Judge Dillon:

"Every citizen holds his property subject to the proper exercise of this power, either by the state legislature directly, or by public or municipal corporations to which the legislature may delegate it. * * * It is well settled that laws and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbance." 1 Dillon on Municipal Corporations (4th Ed.) 212.

See, also, *Thorpe v. Rutland & B. R. Co.,* 27 Vt. 140; *In re Goddard,* 16 Pick. (Mass.) 504. In *Commonwealth v. Alger,* 7 Cush. (Mass.) 53, Chief Justice Shaw uses the language:

"We think it a settled principle, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. * * * Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient. This is very different from the right of eminent domain."

Along the same line, it has been said by the Maine court:

"Police regulations may forbid such a use and such modifications of private property as would prove injurious to the citizens generally. This is one of the benefits which we derive from associating in communities. It may sometimes occasion an inconvenience to an individual; but he has a compensation, in participating in the general advantage. Laws of this character are unquestionably within the scope of the legislative power, without impairing any constitutional provision. It does

not appropriate private property to public uses, but merely regulates its enjoyment." *Wadleigh v. Gilman,* 12 Me. 403.

Without further pursuing this phase of the case in hand, we think it must be said that the statute in question is not open to the objection that it takes or appropriates the property of the defendants to public use without compensation.

IV. Still less is the act open to the objection that it takes the private property of the defendants for the private use of others. As we have already said, it does not deprive the defendants of their property, or assume to give any right or interest therein to anyone. It does assume to regulate its use in the interest of the public; and unless it be found open to the objection that it is clearly unreasonable, and without any substantial relation to that subject, but is a clear and unmistakable infringement of some constitutional guaranty, it must be upheld. Its alleged unreasonable character will be considered in a later paragraph of this opinion. Nor is there merit in the further objection that it attempts to delegate legislative authority to private persons. While the right is conferred upon the inhabitants of a proposed district to initiate the project by petition to the city council, the power of the private citizen ends there. The legislation, if any is had, is by the council, which is the recognized legislative body of the municipal government.

V. Is the restriction upon the use of the property within the established district so clearly unreasonable that it should be held void? This is affirmed by the appellees on various grounds, among which are: (1) Absence of any requirement for notice to property owners; (2) absence of any provision for compensation; (3) it makes a nuisance of an act or condition otherwise lawful; (4) it gives the power of initiative to a possible minority of the inhabitants; (5) it makes a punishable misdemeanor of acts hitherto innocent and lawful; and (6) the area and boundaries of the district are left to the whim of the council, or of 60 per cent of the resident owners. Aside from those objections, which are but a repetition of those we have already considered, based upon constitutional guaranties, and do

5. CONSTITUTIONAL LAW: police power: unreasonable regulations.

not call for further discussion, the points here stated pertain to mere incidentals, and do not go to the jurisdiction or power of the state to authorize, or of the city to enact, the ordinance. The division of the city into districts for any lawful purpose, such as voting precincts, sewer districts, city wards, fire limits, and restricted areas made subject to peculiar police regulations, has never been regarded as a matter requiring notice to property owners; nor is there any sound reason for making such notice a prerequisite to authorized action by the council. It is necessarily committed to the council, which is charged with the duty of administering the affairs of the city; and to make it an essential condition of official action that notice be served on every citizen who may be affected thereby would tend to confusion and delay, and would excite controversy. That a statute or city ordinance or police regulation forbids acts theretofore innocent and lawful, affords no ground for holding such legislation either void or unreasonable. A very large proportion of all our laws, both state and municipal, are of that character. As we have before said, when people are brought together in increasingly crowded masses, it is essential to peace, good order, and general welfare that the individual shall submit to reasonable restrictions upon his natural rights for the public good; and it is not at all strange or unusual that he often finds himself forbidden, under penalty, to do things which, but for some police regulation, would be his unquestionable right. Nor is it of itself a valid objection to a police regulation that it is made applicable to a segregated area or district. This has been frequently held to be the law. To this point we need only cite the case of *Northwestern Laundry v. City of Des Moines*, 239 U. S. 486. There, it will be remembered, the city adopted an "anti-smoke" ordinance, making it applicable to designated parts of the city only. Much of the argument by appellant in that case is quite in line with the contentions of the appellees in this action. The court held that there was no doubt of the authority of the city to "declare the emission of smoke in cities or populous neighborhoods a nuisance and subject to restraint as such; and that the harshness of such legislation, or its effect upon business interests, short of a merely arbitrary enactment,

are not valid constitutional objections." It also overruled the objection to the ordinance as providing for an arbitrary classification.

That the state may directly, or through delegation of authority to municipalities, adopt and enforce reasonable regulations concerning the use and occupation of real estate in cities

6. CONSTITUTIONAL LAW: police power: use of property. and towns' is too well established to admit of serious dispute. In *City of Salem v. Maynes,* 123 Mass. 372, a statute authorizing cities to prohibit the erection of wooden buildings anywhere in the entire municipality or in any district thereof was held valid, as a legitimate exercise of police power. In *State v. Houghton,* 142 Minn. 28 (170 N. W. 853), an application for a permit for erecting a cereal mill in a residential district, to be approved by the building inspector and made in the most modern manner and furnished with proper appliances to make it dust proof and noise proof, was refused, and a petition for mandamus to compel a permit was denied. On appeal, this ruling was sustained, the court saying that, while the restricted area was sparsely settled, and the site of the proposed mill was well adapted to use for industrial purposes, yet there was "no reason why the area might not be suitable for residential purposes, and it had been so designated by the proper tribunal."

A statute that no person shall hereafter erect, occupy, or use in any city a stable for more than four horses, unless first licensed to do so, is sustainable as an exercise of police power. *City of Newton v. Joyce,* 166 Mass. 83. An ordinance making it unlawful to move a blacksmith shop to a residence street, without the written consent of a majority of the property owners, is valid. *Patterson v. Johnson,* 214 Ill. 481 (73 N. E. 761). The court there says that cities and towns organized under the statute "have power to declare what shall be considered as nuisances, and to prevent and remove the same, and to regulate the police of the town, and to make such ordinances as the good of the inhabitants of the town may require."

So, also, under general authority to a city to adopt appropriate ordinances and regulations, an ordinance prohibiting any person from erecting any building within the corporate limits

without obtaining a building permit is not void or unenforcible. *Commissioners of Easton v. Covey,* 74 Md. 262 (22 Atl. 266). The court there remarks:

"The main purpose of the ordinance is to give the commissioners power to *control* the erection of *new buildings,* so that whenever such building, either by the character of the materials of which, or the manner in which, it is proposed to be built, its location in the town, or the character of the business proposed to be carried on therein, would, in their judgment, be *detrimental* to the town, they may prevent its erection by refusing a permit. In each case, the granting or refusal of a permit is confided to their *discretion.*"

The city may prohibit the blasting of rocks within its limits without the written consent of the board of aldermen. *Commonwealth v. Parks,* 155 Mass. 531. In this case, the language of Holmes, J., is in point, where he says:

"It is settled that, within constitutional limits not exactly determined, the legislature may change the common law as to nuisances, and may move the line either way, so as to make things nuisances which were not so, or to make things lawful which were nuisances, although by so doing it affects the use or value of property."

See *Reinman v. City of Little Rock,* 237 U. S. 171. An ordinance prohibiting the operation of laundries during the night in a certain city district is not open to constitutional objection. *Barbier v. Connolly,* 113 U. S. 27. In *Welch v. Swasey,* 193 Mass. 364 (79 N. E. 745), the court had to consider a regulation limiting the height of buildings in the city of Boston. By its terms, a certain limit was fixed for buildings in one district, and a different limit in other districts; and this was held valid. On appeal to the Supreme Court of the United States, the ruling was affirmed. See *Welch v. Swasey,* 214 U. S. 91. To like effect is *Cochran v. Preston,* 108 Md. 220 (70 Atl. 113), sustaining a limitation upon the height of buildings in a residential neighborhood. The operation of a brickyard in an open field, the chief value of which is in the brick clay there found, may be prohibited by a city. *Hadacheck v. Sebastian,* 239 U. S. 394. The location of garages and the storing of oil and gasoline are

proper subjects of police regulation. See *Whittemore v. Baxter Laundry Co.*, 181 Mich. 564; *People v. Ericsson*, 263 Ill. 368 (105 N. E. 315); *Standard Oil Co. v. City of Danville*, 199 Ill. 50 (64 N. E. 1110). In the last cited case, the ordinance prohibited the storing of oils and gasoline within 1,000 feet of any dwelling house, and the court held it not unreasonable. It is there said:

"The general assembly expressly conferred upon the city power to adopt the ordinance. All presumptions are in favor of its reasonableness, and such presumptions must prevail, nothing to the contrary appearing on the face of the ordinance or from the proofs."

In *People v. Village of Oak Park*, 266 Ill. 365 (107 N. E. 636), an ordinance making it unlawful to build or maintain a public garage at any place in the city where two thirds of the buildings within a radius of 500 feet are used exclusively for residential purposes, without the written consent of a majority of the property owners within such radius, is held to be a valid exercise of municipal power. The same rule is sustained in *City of Chicago v. Stratton*, 162 Ill. 494, and in *People v. Ericsson*, 263 Ill. 368 (105 N. E. 315). To the same general effect is *State v. Taubert*, 126 Minn. 371 (148 N. W. 281). In *City of Little Rock v. Reinman-Wolfort A. L. Co.*, 107 Ark. 174, and same case on appeal to the Supreme Court of the United States, an ordinance prohibiting the maintenance of a livery stable in a certain part or district of the city was held open to no constitutional objection. The Supreme Court of Maine, answering an inquiry by the legislature, holds it within the police power of the state to regulate and restrict the cutting of trees on wild and uncultivated land, without compensation to the owner. *In re Opinions of Justices*, 103 Me. 506 (69 Atl. 627). On like principle, the state may prohibit landowners from removing stones, gravel, or sand from their own premises, such restriction being for the public benefit, in protection of a harbor adjacent to such premises. *Commonwealth v. Tewksbury*, 11 Metc. (Mass.) 55. A somewhat similar holding is found in *Commonwealth v. Alger*, 7 Cush. (Mass.) 53. Further application of the principle is found in the more recent, but familiar,

cases which sustain the authority of the state to prohibit the waste by the owner of land of gas, oil, and artesian water produced on his premises. The appellees in the present case place large reliance upon the decision found in *Eubank v. City of Richmond*, 226 U. S. 137. A careful reading of the opinion and of the material facts in that case readily demonstrates the inapplicability of the precedent so established to the question we are here considering. Stated briefly, the ordinance there held invalid provided for the establishment of a building line, to which all buildings thereafter erected must conform. It provided that, whenever the owners of two thirds of the property abutting upon any street should in writing request the street committee of the city council to establish a building line, the committee should proceed to establish such line so that the same should not be less than 5 feet or more than 30 feet from the street line, and that thereafter no permit should be granted for the erection of any building on such front, except it be within the limits of such line. This was held to be invalid, because it "leaves no discretion in the committee on streets as to whether the street line shall or shall not be established in a given case. The action of the committee is determined by two thirds of the property owners. In other words, part of the property owners fronting on the block determine the extent of use that other owners shall make of their lots; and against the restriction they are impotent. This we emphasize."

It will be further noticed that the ordinance there set aside makes no provision whatever for the exercise of any supervision, discretion, or control of the subject by the city council, but makes the establishment of the line absolute and final, upon the action of the committee, which, in turn, has no discretion except to comply with the request of two thirds of the property owners, and fix the line somewhere within the prescribed limits of 5 feet and 30 feet from the street boundary. The decision goes no further than to hold that this kind of regulation is not within the police power. In thus disposing of the case, the court is careful to say:

"We need not consider the power of a city to establish a building line or regulate the structure or height of buildings."

The ordinance upon which we are now called to pass is in marked contrast with the one in the *Eubank* case, supra. Nothing is left to the uncontrolled discretion of a committee, or of private persons. It does not prohibit the erection within the restricted district of business buildings, shops, factories, gasoline stations, or any other class of buildings. It does provide, however, that the described area shall constitute a residence district, and that no buildings shall thereafter be erected therein except residences, schoolhouses, churches, and similar structures, *without first procuring from the city council a permit therefor*. In other words, the provision so made is a regulation, and not a prohibition. That the regulation is, to this extent, a legitimate and reasonable exercise of the city's police power, is supported by a practically unbroken array of authority. The argument by appellees that the growth of the city and the expansion of its business area may or will, in the course of time, crowd upon this restricted district and demonstrate the desirability, if not the need, of lifting or modifying the restriction, is to be conceded; but it must be presumed that, when such conditions arise, the city council will exercise its discretion in the matter of building permits fairly and impartially. It may as well here be said that the validity of the final clause in the second section of the ordinance, reading, ''Nor shall any such permit be granted when 60 per cent of the owners of said real estate residing in the city object thereto,'' is not here directly in issue. No such provision is found in the statute authorizing the creation of resident districts, nor does the statute, in terms or by implication, so fetter the council's discretion. By the terms of the act, the council, in its ordinance creating such district, may provide reasonable rules and regulations under which permits may be issued. Whether this rule as to the effect of objections by property owners to an application for a permit is reasonable, we need not now inquire; and it will be time enough to decide that question when it arises.

Quite in point here is the case of *Storer v. Downey*, 215 Mass. 273 (102 N. E. 321). There, the ordinance provided that no building should be erected or used as a garage unless such use was previously authorized by the board of aldermen. A peti-

tion was duly presented to the board for a permit to erect a garage, and the board passed an order granting the request. This action was vetoed by the mayor, who gave as a reason that he thought some policy respecting garages in residential districts should be adopted, because he was opposed to their establishment in residential districts. Thereupon, the applicant sued for a writ of mandamus for the issuance of a permit. The action of the mayor was sustained, and writ denied. The court there says that the ordinance is a valid exercise of the police power, and adds:

"Oil and gasoline, almost inevitably stored and used in them, are so highly inflammable and explosive that they may increase the danger of fire, no matter how carefully the building be constructed, nor how noncombustible its materials. Although lawful and necessary buildings, they are of such character that regulation of the place of their erection and use is within well settled principles as to the police power."

The foregoing citations and quotations have perhaps been unnecessarily extended; but the question presented by this appeal is one of great and growing importance, and we have felt justified in noting the trend of the authorities with more than ordinary fullness of detail. With the wealth of precedent cited by the appellee as upholding the sacredness of constitutional guaranties of life, liberty, property, due process of law, and equal protection of the laws, we have no quarrel; but when the statute in question is construed, as we do, as one of police regulation, it is entirely consistent with those guaranties. The statute being constitutional, the ordinance adopted pursuant thereto cannot be held invalid. The power of regulation is not confined to the suppression of vice or promotion of health. In the language of McKenna, J., in *Bacon v. Walker*, 204 U. S. 311, 318:

"It extends to so dealing with the conditions which exist in the state as to bring out of them the greatest welfare of its people."

For a discussion of the nature, scope, and effect of a city's authority to "regulate," see opinion by Marshall, J., in *City of Madison v. Southern Wis. R. Co.*, 156 Wis. 352 (146 N. W. 492).

There is no presumption against the validity of an act of the legislature. On the contrary, all presumptions are in its favor, and a statute will not be held unconstitutional unless its

7. CONSTITUTIONAL LAW: necessary showing of unconstitutionality.

contravention of constitutional guaranties is so clear, plain, and palpable as to leave no reasonable doubt on the subject; and where the language is reasonably susceptible of different meanings, the courts will lean to that construction which is consistent with its validity. *State v. Hutchinson Ice Cream Co.,* 168 Iowa 1; *Barr v. Cardell,* 173 Iowa 18; *McGuire v. Chicago, B. & Q. R. Co.,* 131 Iowa 340; *State v. United States Exp. Co.,* 164 Iowa 112; *Brady v. Mattern,* 125 Iowa 158; *Rodemacher v. Milwaukee & St. P. R. Co.,* 41 Iowa 297.

We find nothing in this statute, when reasonably and properly construed, which denies to the appellees the benefit of their constitutional rights, privileges, and immunities; and upon the conceded and well proven facts, we find the appellant city entitled to the relief prayed for in its petition. The decree below is therefore reversed, and cause remanded to the trial court for a decree in harmony with the views expressed in this opinion.— *Reversed and remanded.*

EVANS, C. J., PRESTON and FAVILLE, JJ., concur.

DE GRAFF, J., takes no part.

### SUPPLEMENTAL OPINION.

PER CURIAM.—In a petition for rehearing, it is earnestly contended by appellees that the act of the general assembly authorizing the creation of restricted residence districts in cities

8. CONSTITUTIONAL LAW: construction: in favor of constitutionality.

is unconstitutional, as attempting to confer legislative authority upon private citizens, and making it obligatory upon the city council to establish such district when petitioned therefor by 60 per cent of the owners of real estate therein, even though, as a matter of fact, the petitioners may own only a small fractional part of the property to be affected by such action.

If this were the correct construction to be placed upon the language of the act, the objection thus made would be a serious one; but when it is read with care, and with due regard to the

9. CONSTITUTIONAL
LAW: construc-
tion: "shall"
as permissive
term.

familiar rule that, if the language of a statute is fairly capable of a meaning which is not constitutionally objectionable, it must be so construed, the suggested difficulty disappears. Let us look now to the terms of the statute itself. The first section, containing the grant of authority, is in the following words:

"Cities of the first class, including cities under commission form of government, and cities under special charter may (*and upon petition of sixty per cent of the owners of the real estate in the district sought to be affected residing in such city shall*) designate and establish, by appropriate proceedings, restricted residence districts within its limits."

The italics and parenthetical marks our ours. For reasons already sufficiently considered, the validity of such a delegation of power to the city is not open to doubt, unless, as contended by counsel for appellees, it is to be held vitiated by the parenthetical clause which we have italicized. Opposed to any such ruling there are two insuperable obstacles:

(1) Even if the clause be held invalid as an unconstitutional delegation of power to private citizens to control the legislative functions of the city council, its judicial condemnation does not involve nor require the condemnation of the entire act in which it is found. In other words, the clause may be obliterated entirely, without affecting the validity of the grant of power to the city.

(2) To preserve the constitutionality of the act, the word "shall," found in said clause, will be held to be not mandatory, but directory or permissive. *Santo v. State,* 2 Iowa 165; *State v. County Judge,* 2 Iowa 280; *Duncombe v. Prindle,* 12 Iowa 1; *Cook v. Marshall County,* 119 Iowa 384; *Parish & Porterfield v. Elwell,* 46 Iowa 162; *State v. Minor,* 106 Iowa 642, 648; *Jordan v. Circuit Court,* 69 Iowa 177, 179; *People v. Sanitary Dist.,* 184 Ill. 597 (56 N. E. 953); *Burns v. Henderson,* 20 Ill. 264; *Thompson v. Board of Trustees,* 144 Cal. 281 (77 Pac. 951); *City of Denver v. Londoner,* 33 Colo. 104 (80 Pac. 117, 121); *State v.*

*Board of Com.,* 27 Nev. 469 (77 Pac. 984) ; *Norman v. Thompson,* 30 Tex. Civ. App. 537 (72 S. W. 64).

The above cited case of *Thompson ·v. Board of Trustees* is quite in point. There, an ordinance provided that, on petition of a certain per cent of voters, "the board of trustees *shall* submit [a certain proposition] ·to ·said voters;" and it was held that the duty so imposed was not mandatory. So, also, in *City of Denver v. Londoner,* supra, a charter provision that the city council *"shall pass"* an assessing ordinance when recommended by a board of public works was construed as meaning that the council *may* pass such ordinance. The precedents to this general effect are quite numerous, but we have mentioned sufficient to show the trend of all the authorities.

We are, therefore, disposed to hold that, while the statute here in question authorizes the stated percentage of property owners in a proposed restricted residence district to initiate a movement therefor by petition to the city·council, such petition or consent does not impose upon the council the mandatory duty to enact the requested ordinance. In other words, the enactment of such an ordinance remains within the legislative discretion of the council.

What we have said with reference to the absence of mandatory effect of a petition to establish a district is doubtless equally applicable to that provision of the ordinance not found in the statute, as to the effect of objection by 60 per cent of the property owners to any proposed building permit. That question is, however, not directly raised in this appeal; but we speak of it to remove, if practicable, a possible occasion for future litigation. The petitions for rehearing by the several appellees are overruled.